# PORTER v. PITTSBURG BESSEMER STEEL COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF INDIANA.

Submitted January 7, 1887. — Decided March 21, 1887.

In this case unsecured floating debts, due by a railroad company for construction, were, in the absence of a statutory provision, held not to be a lien on the railroad superior to the lien of a valid mortgage on it, duly recorded, and of bonds secured thereby, and held by *bona fide* purchasers for value.

The question of what is a final decree, from which an appeal can be taken, considered.

THESE were five appeals brought by Henry H. Porter, in which the Pittsburg Bessemer Steel Company (Limited), the Cleveland Rolling Mill Company, the Smith Bridge Company, Crerar, Adams & Company, and Volney Q. Irwin are severally appellees.

The material facts out of which the questions for consideration arose were as follows:

In March, 1880, the Indiana and Chicago Railway Company was incorporated to construct and operate a railroad from a point on the state line of Indiana, in Lake County, to Attica, in Fountain County, Indiana. William Foster was the chief promoter of this enterprise, and was the president of the company, and of its successor, the Chicago and Great Southern Railway Company, from the organization of the Indiana and Chicago Railway Company down to March 15, 1882. From March, 1880, to June 23, 1881, Foster owned substantially all of the stock of the Indiana and Chicago Railway Company which had been issued, a few shares being held by the other directors, and he controlled the enterprise. Prior to June 23, 1881, the work of construction and of procurement of the right of way had progressed so far as Foster could procure and pay for the same, by the issuing of $50,250, par value,

of paid up capital stock of the company, of all of which stock Foster had on June 23, 1881, become the owner.

Prior to June, 1881, Henry Crawford purchased from A. J. Dull and Henry McCormick the entire capital stock, being 8648 shares, of the Chicago and Block Coal Railroad Company. This was a company organized and incorporated by the purchasers, at a foreclosure sale, of the Indiana North and South Railroad, and it owned and operated a railroad extending south from Attica, through Veedersburg, in Fountain County, to Yeddo, a little over twenty miles in length. It had also procured some right of way and constructed some road-bed south of Yeddo, in the direction of Brazil, Indiana. The purchase price of this stock was $200,000. Crawford made a cash payment of part at the time and gave his notes for the residue, the stock remaining in pledge with the vendors, as security for the payment of the notes.

On June 23, 1881, Foster sold to Crawford 1005 shares of the capital stock of the Indiana and Chicago Railway Company, of the par value of $50,250, under a written contract, by which Foster guaranteed to Crawford that the stock thus sold was all of the capital stock of the company, excepting $10,000 par value still held by Foster, and that the company was under no obligation to issue any more stock, except a small amount for rights of way contracted to be paid for in stock. In connection with this contract, a certificate of the secretary of the Indiana and Chicago Railway Company was delivered to Crawford, showing the exact amount of capital stock then outstanding. The $10,000 of stock retained by Foster had been issued to him in payment of his salary and personal expenses in connection with the enterprise.

On June 23, 1881, the company had no assets excepting the road-bed and right of way, which had been constructed and procured with the money represented by the $50,250 of stock, and excepting some $50,000 of aid voted by certain townships along the line, but not yet collected.

Foster remained president, and his board of directors remained directors, until March 15, 1882. Immediately after his purchase of the stock on June 23, 1881, Crawford, without any

specific contract with the Indiana and Chicago Railway Company, began furnishing from his own means the money and material with which the work of constructing the road was carried on.

On July 14, 1881, the board of directors of the company, at a special meeting, adopted a resolution, changing its name to that of "The Chicago and Great Southern Railway Company." On October 29, 1881, the board of directors of the Chicago and Great Southern Railway Company adopted resolutions authorizing the execution of the mortgage and the issuing of the bonds involved in this litigation. At that time, Crawford was not a director or officer of the company. The mortgage and the bonds bear date November 1, 1881. The resolutions authorized the issuing of bonds to the amount of $2,000,000, and the mortgage secures that amount. The mortgage was made to John C. New, as trustee, and describes the mortgaged premises as follows: "All and singular the northern division of railway of the said party of the first part, as the same now is or may hereafter be constructed, between Brazil, Clay County, Indiana, extending thence northwardly through the counties of Clay, Parke, Fountain, Warren, Benton, Newton, and Jasper to a junction with the Louisville, New Albany and Chicago Railway, at or northwest from Rensselaer, Indiana, being about one hundred miles in length."

Between June 23, 1881, and January 1, 1882, Crawford furnished from his own means over $300,000, which was paid out for work and material used in constructing the road between Attica and the junction at Fair Oaks, northwest of Rensselaer. In addition to this, Crawford, prior to January 1, 1882, had paid out of his own means to Dull and McCormick, upon his purchase of the stock of the Chicago and Block Coal Company, the sum of $85,000, leaving $115,000 and all interest still unpaid.

From June 23, 1881, onwards, Foster and his board of directors looked to Crawford to furnish the money and material with which to carry on the work of construction.

In pursuance of the resolutions of October 29, 1881, the mortgage was prepared and executed, and was duly recorded,

in November, 1881, in the several counties through which the line of the railroad ran.

About the last of December, 1881, Foster, then president of the Chicago and Great Southern Railway Company, executed and delivered to Crawford — the actual delivery being made to one Starin, an employee of Crawford, at Crawford's office at Chicago, Crawford being absent — 1000 bonds, each for $1000, negotiable in form, and payable to. New or bearer, making $1,000,000, the payment of the bonds and of the interest coupons attached thereto being secured by the said mortgage. At the same time with the delivery of the bonds, Foster also delivered to Starin, for Crawford, the following memorandum, unsigned, but in the handwriting of Foster:

"Memorandum of agreement between the Chicago and Great Southern Railway Company and Henry Crawford as to applying the proceeds of an issue of one million dollars of bonds under date of November 1, 1881.

"First. In payment of Block Coal road, purchased by said Crawford, and the contract assigned by him to the Chicago and Great Southern Railway Company, with which it is to be consolidated, as provided by law.

"Second. To reimburse said Crawford for money advanced, and to be hereafter advanced, for construction and equipment of the Chicago and Great Southern Railway, which the bills of purchase and vouchers for the necessary payments shall be the evidence of expenditures made.

"Third. Any balance from the proceeds of the first issue or any subsequent issue shall be used and applied to the extension and development of the line of road covered by the mortgage of November 1st, 1881.

"Fourth. It is understood and agreed that said Crawford is to furnish the necessary amount of money to pay the debts contracted since the 1st of July, 1881, and to complete grading and superstructure, and to furnish and equip the line of road from junction with Air Line to Attica, as fast as the work can be done."

Prior to the delivery of the bonds by Foster to Crawford, Crawford had assigned to the Chicago and Great Southern

Railway Company his contract with Dull and McCormick for the purchase of the stock of the Chicago and Block Coal Railroad Company. When the bonds were thus delivered to Crawford he had no official connection with the company, but owned $50,250 of its stock, and had furnished to it a large amount of money, which it had paid out for construction.

In December, 1881, Crawford's note to Dull and McCormick matured and was unpaid. Crawford negotiated with Dull for an extension of time, and Dull agreed to give the extension if Crawford would deposit with him, as additional collateral security, all of the bonds then issued by the Chicago and Great Southern Railway Company, and all the stock which he had bought from Foster, and if he would also, by an agreement with New, the trustee, prevent the issue of any more bonds without Dull's written consent. This arrangement was carried out, and, on the 27th of January, 1882, Crawford delivered to Dull all of the stock which he had bought from Foster, and the 1000 bonds which Foster had delivered to him, and also procured from New the following paper, which was delivered to Dull:

"I, John C. New, of the city of Indianapolis, in the state of Indiana, do hereby make known, that, as trustee in a certain mortgage or deed of trust, bearing date the 1st day of November, 1881, made and executed by the Chicago and Great Southern Railway Company, a corporation of the state of Indiana, to me, as trustee, covering the railroad and other property of said company, to secure a certain issue of first-mortgage bonds of said company, aggregating the sum of two millions of dollars, I have, as such trustee, certified for issue one thousand of said bonds, of one thousand dollars each, and no more, and, at the request of Henry Crawford, Esq., of Chicago, I agree that I will, as such trustee, certify no more of said bonds without the consent in writing of A. J. Dull, Esq., of Harrisburg, Pa.

"Dated at New York, January 27, 1882.

JNO. C. NEW, *Trustee.*"

At this time, the balance due to Dull and McCormick was $115,000 and interest. The $85,000 which Crawford had paid to Dull and McCormick was in addition to the money he had furnished for constructing the new road north from Attica.

In February, 1882, the work of constructing the railroad being still in progress, and Crawford still continuing to furnish, without any contract with the company, the money used in prosecuting the work, he requested Foster and his board of directors to enter into a construction contract with him, and he sent to the board a written contract which he desired it to execute. The board, on the 7th of February, 1882, unanimously rejected the contract. Crawford then procured Foster to call another meeting of the board, which was held on March 15, 1882. Crawford attended this meeting, it being the first at which he was present. Becoming satisfied that Foster would prevent any contract or settlement from being made with him, unless he would buy from Foster the $10,000 of stock still held by Foster, he purchased that stock from Foster, and the two entered into a written contract, dated March 15, 1882, by which Crawford became the owner of all the remainder of the capital stock of the company. Crawford on the same day assigned and transferred to each of the following persons one share of the capital stock of the company, viz.: Henry Crawford, Jr., William A. Starin, D. H. Conklin, F. F. Lacey, H. Moore, G. W. McDonald, D. J. Lyon and H. Meiselbar. On the same day, Foster and his board of directors, at the request of Crawford, resigned, and Crawford caused himself and the eight persons above named to be elected directors of the company. On the same day, Crawford was elected president of the company, and remained such for four days, until March 18, 1882, when he ceased to be president and director; and he had no official connection with the company from that time until April or May, 1883, when he was again elected director and president.

On March 18, 1882, the new board of directors passed a resolution approving the mortgage to New, and ordering it to be copied at length in the minutes of the meeting, which was done. At the same meeting the board of directors entered

into a construction. contract with Crawford.  Between June 23, 1881, the date of Crawford's first purchase of stock from Foster, and March 18, 1882, the date of the construction contract, Crawford had paid out of his own means, for labor and material used in the construction of the company's railroad north from Attica, about $400,000, and for the purchase of the stock of the Chicago and Block Coal railroad, extending south from Attica, $85,000.

The Chicago and Block Coal Railroad Company and the Chicago and Great Southern Railway Company were consolidated in the spring of 1883, under the name of "The Chicago and Great Southern Railway Company."  On the 9th of April, 1883, the consolidated company executed and delivered to John C. New, as trustee, a deed of further assurance, covering the railroad and property of the Chicago and Block Coal Railroad Company, extending southwardly from Attica to Yeddo, in addition to the property covered by the mortgage of November 1, 1881, and making the first named property a further security for the bonds issued under the mortgage of November 1, 1881.  This deed of further assurance was duly recorded in the counties along the line of the railroad: ·

The work of construction was carried on until January, 1883, Crawford furnishing from his own means all the money paid for labor and material used in the construction between June 23, 1881, and January 5, 1883, except about $40,000 received on account of aid voted by certain townships along the line, which was also expended in paying for construction. Between January 23, 1882, (the date at which Crawford pledged the bonds and stock to Dull and McCormick,) and January 5, 1883, Crawford had been endeavoring either to sell the bonds so pledged to Dull and McCormick or to hypothecate them for a loan sufficiently large to pay off Dull, and McCormick, and also to furnish money to build the road from Fair Oaks to Attica.  Between June 23, 1881, and January 5, 1883, there had been paid out for the construction of the railroad about $500,000, all of which had been furnished by Crawford, except about $40,000 received from township aid.

On January 5, 1883, Crawford negotiated a loan from Drexel,

Morgan & Co., a banking house in the city of New York, under a written contract. This contract provided for a loan of $400,-000, $250,000. to be paid at once, out of which the balance due to Dull and McCormick for the Chicago and Block Coal railroad was to be paid; $50,000 more to be paid when the new road should be completed from Iroquois River to Fair Oaks; $50,000 more when the road should be completed eight miles · south from Oxford, and when Crawford should furnish satisfactory proof to Drexel, Morgan & Co. that he had put into the work $50,000 of his own money, in addition to all the moneys theretofore expended by him upon the construction of the road; the last $50,000 to be paid when the line should be completed from Fair Oaks to Yeddo. Crawford was to procure the consolidation of the Chicago and Block Coal railroad with the Chicago and Great Southern railway. As security for this loan, all of the capital stock of the Chicago and Block Coal Railroad Company, all of the capital stock of the Chicago and Great Southern Railway Company, and all of the bonds of the latter company, either then issued or thereafter to be issued, were to be delivered to and held by Drexel, Morgan & Co. Crawford was to give his individual notes for the loan, and Drexel, Morgan & Co. were to appoint, and did appoint, an agent to superintend the expenditure of all the money to be advanced by them, the money to be paid out only upon drafts drawn by Crawford and approved and countersigned by such agent. Under this contract, Drexel, Morgan & Co. advanced $350,000. As part of it, they paid to Dull and Mc-Cormick, on January 5, 1883, $132,379.99, being the entire balance due on the purchase of the stock of the Chicago and Block Coal Railroad Company, and received from Dull and McCormick all of the stock and bonds which they held as collateral. Drexel, Morgan & Co. received this stock and these bonds, not from Crawford, but from Dull and McCormick, Crawford never having had possession or control of the stock or the bonds from the time when he pledged them to Dull and McCormick. The remaining $217,620.01 was paid by Drexel, Morgan Co., through their agent, directly for labor and material used in the construction of the railroad, and was paid at

various times between January 5, 1883, and September, 1883. During the same period, Crawford, in addition to what he had theretofore expended out of his own means in the work of construction, and in addition to the money so paid by Drexel, Morgan & Co., paid out of his own means more than $50,000 for labor and material used in the construction of the railroad between Oxford and Attica. From January 5, 1883, to September, 1883, the contractors, sub-contractors, furnishers of material and laborers were informed and understood that the money paid to them from time to time during that period was mainly derived from a loan negotiated upon the mortgage bonds of the railway company. Each of these five appellees knew of the pledge of these bonds to Drexel, Morgan & Co. for this loan, and knew that they were getting part of the money loaned by Drexel, Morgan & Co.

After the Drexel, Morgan & Co. loan was exhausted, the work of construction was continued, the money paid for labor and material being furnished by Crawford, until about February, 1884, when the new road was so far constructed as to enable trains to be run from Attica to the junction at Fair Oaks. On the 18th of February, 1884, Crawford submitted to the board of directors a report, showing the then condition of the work, and asked the board to issue to him, in addition to the $1,000,000 of first mortgage bonds theretofore issued, a further sum of $200,000 of the first mortgage bonds, $1,200,000 of capital stock, and $1,200,000 of income bonds, as a payment to him on account. On the same day the board of directors passed the following resolution: "That, as a payment on account for the work done and material furnished up to the present time under such construction contract, there be allowed and paid to the contractor or order the sum of two hundred thousand dollars of first mortgage bonds, (in addition to the one million dollars heretofore appropriated,) and also ($1,200,000) one million two hundred thousand dollars of income bonds, and ($1,200,000) one million two hundred thousand dollars in the common stock, full paid, of this company, the proper officers of the company to execute the foregoing resolutions and take the proper vouchers for all payments."

No income bonds were ever issued by the company. On the 5th of May, 1884, at the request of Crawford, the board of directors adopted a resolution, providing for an exchange of the old Indiana and Chicago Railway Company stock and of the old Chicago and Block Coal Railroad Company stock for new stock of the consolidated Chicago and Great Southern Railway Company. At the same meeting the board passed a resolution, that, in addition to the consolidated stock to be issued in exchange for the old stock of the original companies, the secretary should issue and deliver to the contractor additional new stock, as payment under the construction contract, so as to make the total consolidated stock outstanding amount to $1,200,000, par value. This exchange of stock was made, and enough additional new stock of the consolidated company was issued to make its total stock outstanding amount to $1,200,000, par value, all of which stock was delivered to Drexel, Morgan & Co. under their contract of loan. When Dull and McCormick, on January 5, 1883, delivered their stock and bonds to Drexel, Morgan & Co., they also delivered to the latter the following consent:

"John C. New, trustee:

"I hereby consent to the issue and certification of the remaining $1,000,000 of Chicago and Great Southern Railway bonds, whenever you are so requested to do by Drexel, Morgan & Co.

"New York, Jan. 5, 1883.                    A. J. DULL."

The additional $200,000 of bonds which Crawford was authorized to receive by such resolution of the board of February 18, 1884, were issued. Drexel, Morgan & Co. procured New, as trustee, to certify them, and they were delivered by Crawford to Drexel, Morgan & Co., in August, 1884.

While the construction of the railroad was in progress, Crawford became indebted to the First National Bank of Chicago in the sum of about $300,000, about two-thirds of which money Crawford expended in the construction of the Chicago Air Line railroad, and about one-third of it in the

construction of the Chicago and Great Southern railway. While the bonds and stock of the Chicago and Great Southern Railway Company were so held in pledge by Drexel, Morgan & Co., Crawford gave to the First National Bank of Chicago a second pledge of the same bonds and stock, to secure the payment of his indebtedness to the bank, he having already pledged to it certain other securities and property, as collateral. Crawford's notes to Drexel, Morgan & Co. matured and were not paid. Drexel, Morgan & Co., under the power given to them in their contract with Crawford, of January 5, 1883, advertised the pledged bonds and stock to be sold on June 2, 1884. By a written agreement between Crawford and Drexel, Morgan & Co., made May 27, 1884, the sale was postponed to June 20, 1884. In the meantime, Samuel M. Nickerson, President of the First National Bank of Chicago, which held the second pledge of the securities held by Drexel, Morgan & Co., and Henry H. Porter, a director and stockholder of the bank, entered into negotiations with Drexel, Morgan & Co. respecting the purchase of the bonds and stock from them, if Crawford should further fail to pay his debt to them and to redeem the securities. These negotiations resulted in a contract between Crawford and Drexel, Morgan & Co., by which the time of payment was extended for sixty days from June 20, 1884, and a further contract between Nickerson and Porter of the one part, and Drexel, Morgan & Co. of the other part, by which Nickerson and Porter agreed to buy the pledged securities from Drexel, Morgan & Co., and to pay them their claim in full with interest, if Crawford should fail to pay his debt to them at the expiration of the sixty days. These two contracts were both of them dated June 25, 1884. Crawford failed to pay his debt to Drexel, Morgan & Co. within the sixty days. Prior to January 12, 1885, Porter purchased Nickerson's interest in the contract of June 25, 1884, between Nickerson and Porter, and Drexel, Morgan & Co. On January 12, 1885, Porter paid to Drexel, Morgan & Co. $392,363.24 by drafts, and sent them the drafts enclosed in a letter, in which Nickerson concurred. Drexel, Morgan & Co. received the payment, and delivered the pledged bonds

and stock to Porter, accompanying the delivery with a letter giving in detail a list of the stocks, bonds, notes, agreements and papers held by them as collateral to the loan. One of the papers enclosed by them to Porter was a consent signed by them, authorizing New, as trustee, to certify the remaining uncertified $800,000 of first mortgage bonds whenever so requested to do by Porter. Porter associated with himself certain other persons, who entered into a subscription or syndicate agreement, for the purpose of buying in the railroad and reorganizing, completing, and extending it. By this agreement it was provided, that Porter, as the agent and attorney of the parties concerned, should go on "in his own name" and foreclose the mortgage, sell the property, bid it off, reorganize the company, and convey the property to be purchased under the foreclosure to the reorganized company. The agreement was, in effect, one by the subscribers to pay so much money for so much stock and bonds of the new company to be organized after the foreclosure and sale by Porter. It gave to Porter absolute power over and control of all the bonds of the existing company, with full authority in his own name to foreclose the mortgage and reorganize the company upon the foreclosure purchase, and conduct and control the new enterprise.

On the 26th of December, 1884, Porter and Crawford entered into a contract, under which Porter and the syndicate represented by him purchased and became the absolute owner of any and all right Crawford might have to redeem from Porter the bonds and stock he should receive from Drexel, Morgan & Co., by paying to him the amount he should pay to them. This contract recognized the right of Crawford so to redeem the bonds and stock. Drexel, Morgan & Co. did not sell the bonds and stock at public auction on notice, but sold to Porter at private sale their debt against Crawford, and put Porter in their place as to the collateral security for the debt. Crawford was willing that Porter should take the bonds and stock in this way if he, Crawford, could still have an opportunity to protect his second pledge of them to the First National Bank of Chicago. By this contract Porter and

his associates fixed the ultimate price they were willing to pay for the bonds and stock, which price left a margin for the bank after paying off Drexel, Morgan & Co. On the same day, and as a part of the same transaction, Crawford, by written assignment, transferred to the First National Bank of Chicago all of his right, title, and interest in and to the contract of the same date between himself and Porter, and all the rights, claims, demands, moneys, and payments he, Crawford, might be or become entitled to by reason of and under that contract. These two instruments simply constituted the method pursued to protect the bank in its second lien upon the bonds and the stock, and were entered into for the purpose of securing to it any margin of value there might be in the bonds and stock, after paying the Drexel, Morgan & Co. debt.

The amount of money furnished by Crawford and expended in the construction of the railroad during the time the Drexel, Morgan & Co. loan was being used in construction, and during the time after that loan was exhausted, amounted to at least $250,000, in addition to the moneys which Crawford had theretofore paid out for such construction. The total expenditure in constructing the Chicago and Great Southern railway was something over $1,000,000, all of which came from Crawford's private means, and from the Drexel, Morgan & Co. loan, except some $40,000 or $50,000 received from aid voted by some townships along the line. The mortgage bonds involved in this litigation represent this $1,000,000 expended in construction, and the accrued interest thereon. The railroad from Yeddo to Fair Oaks was opened for business in April or May, 1884. Prior to the appointment of a receiver, on October 28, 1884, the company did not earn sufficient money to pay its operating expenses. No interest was ever paid on any of the mortgage bonds issued by the company. Crawford never received anything from the company for personal services or expenses, or any repayment of moneys expended by him in constructing the railroad.

On October 27, 1884, John Hack and others filed a creditors' bill in the Circuit Court of Jasper County, Indiana, against

the Chicago and Great Southern Railway Company and Henry Crawford. On the same day, that court entered an order appointing Philip B. Shumway receiver. Afterwards, on March 5, 1885, Crawford filed his answer in the suit, disclaiming all interest in its result, and upon that answer an order was entered that Crawford recover from the plaintiffs his costs, and that he had no interest in any controversy pertaining to the action. On February 26, 1885, the court removed Shumway and appointed as receiver, in his stead, William Foster. In the order appointing Foster there was this provision:

" And the Court, as a condition of the appointment of said receiver, reserves the right to make any further order respecting the priority and payment of labor and supply claims accruing prior to the receivership herein as may hereafter seem and appear to the court to be equitable and just."

On the 4th of April, 1885, the Hack suit was removed into the Circuit Court of the United States for the District of Indiana. On the 9th of March, 1885, Porter filed in that court his bill of complaint against the Chicago and Great Southern Railway Company, John C. New, trustee, and others, alleging that New, as trustee, refused to bring the suit, and praying for the foreclosure of the mortgage of November 1, 1881, and of the deed of further assurance of April 9, 1883. On the 18th of April, 1885, this suit and the Hack suit were consolidated under the title of the Porter suit. On April 29, 1885, and August 15, 1885, orders were entered authorizing the receiver to issue certificates to pay receiver's indebtedness, and to make needed repairs and replacements on the railroad. Under these orders receiver's certificates, amounting in the aggregate to $153,000, were issued. The railway company filed an answer in the consolidated suit, admitting the averments of the bill. A decree *pro confesso* was entered against New, trustee. Various creditors of the company were made parties defendant to the bill, some being judgment creditors and some not. Other creditors filed intervening petitions. In May, 1885, the trustees of four townships, two in Benton County, and two in Newton County, which had voted aid in the construction of the railroad amounting to about $40,000, applied

to the court, as trustees of common schools, to be made defendants, and to be allowed to defend against the foreclosure; but the application was denied.

In June, 1885, the same trustees, as trustees of the townships voting aid, applied to be permitted to defend against the foreclosure, as minority stockholders.   This application was denied on the ground that under the statutes of Indiana the individual tax-payers of the townships which had voted aid were entitled to the benefit of the stock, in proportion to the amount of taxes paid by them respectively.   Thereupon, John W. Swan and Cephas Atkinson, as tax-payers of two townships, applied for leave to become defendants and to defend against the foreclosure.   Without disposing of that application the court, on the 17th of August, 1885, entered a decree of foreclosure and sale.

On the 30th of September, 1885, the application of Swan and Atkinson was reheard by the court, and it entered an order admitting Swan and Atkinson as defendants, and allowing them to file their petition and answer.   The order contained this provision: "This order shall in nowise affect the decree heretofore made for the sale of the railroad by the court or rights of parties thereunder."   Swan and Atkinson filed their petition and sworn answer, charging that the mortgage and the bonds were fraudulently executed and issued, and were without consideration and void, and that Crawford's construction contract was fraudulent and void. - On October 8, 1885, Swan and Atkinson and others filed a petition to set aside the foreclosure decree of August 17, 1885, containing substantially the same charges against the mortgage that were contained in the answer of Swan and Atkinson.   On the 12th of October, 1885, the court set aside the foreclosure decree, and made an order giving the defendants thirty-nine days in which to take their evidence " as to so much of said case as involves the validity of the mortgage and mortgage debts, as the same are described in the bill of said Porter and the defendants' answers."   Porter filed a replication to the answer of Swan and Atkinson.

Voluminous testimony was taken, on which the case was

heard, and a decree of foreclosure was entered on the 16th of February, 1886. That decree denied the relief prayed by the answer of Swan and Atkinson, as stockholders, and dismissed their petition. It declared that 1200 of the mortgage bonds were issued and delivered by the company to Crawford; that 1000 thereof were to be accounted for by Crawford under the construction contract; that 200 of them were delivered to Crawford under that contract; that the 1200 bonds were sold and delivered by Crawford to Porter and his associates; and that the remaining 800 of them had never been issued. It recited the making, delivery, and recording of the two mortgages of November 1, 1881, and April 9, 1883; that the company defaulted in paying the interest due July 1, 1882, on the bonds; that there were $291,860 of interest in default upon the bonds issued; and that the mortgages " are valid and binding obligations as against the" company, and a paramount lien on all the property thereby conveyed, " excepting as hereinafter provided." It then proceeded to decree as follows:

" Sixth. That all unpaid valid claims against said railway company, accrued for right of way, lands, labor, rolling-stock, and material used in the construction and betterment of said railway, whether reduced to judgment or remaining in open account, are hereby adjudged and decreed to be prior, superior, and paramount to the lien of the said mortgages or deeds of trust and the bonds secured thereby; that all unpaid valid claims for labor, supplies, rolling-stock, and material used in the operation of said railway prior to the appointment of a receiver, whether reduced to judgment or remaining in open account, are hereby adjudged and decreed to be prior, superior, and paramount in lien to the said lien of said mortgages or deeds of trust and the bonds secured thereby; and all of said claims accrued in the construction of said railway and its betterment; and all of said claims accrued in the operation of said railway, prior to the appointment of a receiver, as hereinabove in this paragraph of this decree described; are hereby adjudged and decreed to be prior, superior, and paramount in lien to the lien of any and all receiver's certificates issued under the order of this court in this cause, excepting only

receiver's certificates to the amount of twenty-three thousand dollars ($23,000), issued under the order of this court of April 29, A. D. 1885, the proceeds of said certificates other than said twenty-three thousand dollars ($23,000) representing construction or betterment of said railway.

" Seventh.   That all court and receiver's indebtedness accrued against said property since the appointment of a receiver is hereby adjudged and decreed to be prior, superior, and paramount in lien to the lien of said mortgages or deeds of trust and the bonds secured thereby."

It then provided for the sale of the mortgaged property at public auction, by a master, for not less than $500,000; for the payment of the purchase money into the registry of the court; and for a reference to the master to take testimony and report his findings and such testimony as to certain specified matters, among which was the following :

" 5. The amount due the several claimants under the sixth paragraph of this decree, showing the amount due each claimant and the aggregate amount due upon each of the two classes of the claims mentioned in said sixth paragraph."

On March 27, 1886, the railroad was sold by the master, and bought by Porter, for $501,000.   On April 5, 1886, the sale was confirmed by the court, and the purchaser was empowered to pay, as cash, in part payment of the purchase money, all receiver's certificates outstanding, then amounting, with interest, to $157,884.64, the remainder of the purchase money, $343,115.36, being paid in cash.

The reference was had before the master, and much testimony was taken upon it.   On August 31, 1886, the master filed his first report under the reference, in which he allowed the following claims at the following amounts : The Cleveland Rolling Mill Company, $29,643.97; Crerar, Adams & Company, $7809.94; the Smith Bridge Company, $20,900.24; the Pittsburg Bessemer Steel Co. (Limited), $12,944.20.   Porter duly filed exceptions to these allowances.   On the 8th of October, 1886, the master filed his report as to the claim of Irwin, allowing it at the sum of $10,950.30.   Porter duly excepted to this allowance.   On the 9th of October, 1886, on a hearing on

the reports and exceptions, the court made the following decree:

"First. That the said five several defendants, claimants and intervening petitioners hereinbefore named, have each done work or furnished materials which have been used in the construction and betterment of the railway of said Chicago and Great Southern Railway Company prior to the appointment of the receiver therefor, which respective claims for such labor and material are valid claims against said railway company to the amounts hereinafter named, and which said amounts are adjudged and decreed to. be valid claims under and in pursuance of the sixth paragraph of the decree heretofore, on the 16th day of February, 1886, entered in this cause, prior and superior and paramount to the lien of the mortgages or deeds of trust in said decree mentioned and the bonds secured thereby.

"Second. And the court further finds, that there is now in the registry of this court, to the credit of this cause, the sum of $325,194.27, derived from the sale of said property, and remaining after the payment of all receiver's certificates and certain of the indebtedness incurred by the court since it assumed the control and management of said railroad, and which sum is largely in excess of the total amount of claims filed or proven under the terms of said decree entered on the 16th day of February, 1886, including all unpaid costs and indebtedness incurred by the court since it took possession of said railway property.

"Third. And the court further finds that there is due to the Smith Bridge Company the sum of $20,900.24, with interest to be added from the 27th day of October, 1884, at the rate of six per cent. per annum.

"That there is due to the Cleveland Rolling Mill Company the sum of $29,643.97, with interest to be added from the 27th day of October, 1884, at the rate of six per cent. per annum.

"That there is due to Crerar, Adams & Co. the sum of $7809.94, with interest to be added from the 27th day of October, 1884, at the rate of six per cent. per annum.

"That there is due to the Pittsburg Bessemer Steel Com-

pany the sum of $12,944.20, with interest to be added from the 27th day of October, at the rate of six per cent. per annum.

" That there is due Volney Q. Irwin the sum of $11,450.30, with interest to be added from the 27th day of October, 1884, at the rate of six per cent. per annum.

" Which several sums of money are due to said above-named parties, respectively, for and on account of labor or material used in the construction and betterment of said railway, as provided and set forth in the sixth paragraph of said decree, entered in said cause on the 16th day of February, 1886.

" It is, therefore, finally ordered, adjudged, and decreed by the court, that the clerk of this court shall pay out of the said fund in the registry of the court to the credit of this cause, the said several sums of money, with interest to be computed thereon, to the said parties, respectively, or their solicitors of record, viz.: To the Smith Bridge Company, the sum of $23,-345.54; to the Cleveland Rolling Mill Company, the sum of $33,112.32; to Crerar, Adams & Co., the sum of $8723.71; to the Pittsburg Bessemer Steel Company, the sum of $14,458.65; to Volney Q. Irwin, the sum of $12,789.98.

" Said several payments shall be made, with interest at the rate of six per centum per annum from the date of the entry of this decree, in full payment and discharge of said respective claims against said railway property and franchises."

Porter appealed separately from each of these decrees and orders of payment, and these were the appeals now presented for consideration.

*Mr. J. E. McDonald, Mr. John M. Butler, Mr. A. L. Mason, Mr. O. Peckham,* and *Mr. R. B. F. Pierce* for appellant.

*Mr. A. C. Harris, Mr. W. H. Calkins, Mr. John S. Cooper,* and *Mr. E. W. Tolerton* for appellees.

MR. JUSTICE BLATCHFORD, after stating the facts as above reported, delivered the opinion of the court.

It it alleged that the Circuit Court erred in decreeing the several claims of these five appellees to be liens on the railroad

and property of the original Chicago and Great Southern Railway Company superior to the lien of the mortgage of November 1, 1881; and that it also erred in decreeing these claims to be liens on the railroad and property of the consolidated company superior to the lien of the mortgage of April 9, 1883, conveying the railroad and property formerly known as the Chicago and Block Coal railroad.

It is urged, in maintenance of the decree below, that the relations which Crawford sustained towards the several appellees when their claims respectively accrued, and his relations to the railway company, were such as to preclude him from acquiring the mortgage bonds in controversy to the prejudice of the appellees; that his construction contract was fraudulent and void as against the appellees, as creditors of the company; that, as between him and the appellees, he is estopped, by the provisions of his construction contract, from claiming the right to a prior lien upon, or an equal distribution of, the proceeds of sale of the property of the company; that the legal situation was that of a nominal corporation vested with the legal title to its property for the use of Crawford as sole beneficiary; that Dull and McCormick received the bonds subject to the same equities against them which could be urged while they were in Crawford's possession; that the equities of the appellees against the $1,000,000 of bonds, in the hands of Drexel, Morgan & Co., were precisely what they were while the bonds were in the hands of Crawford; that the appellees are entitled, in equity, to be paid out of the assets of the company the amounts of their respective claims in preference to Crawford; that all rights which Nickerson and Porter might have had to be subrogated to the position of Drexel, Morgan & Co. were lost by the syndicate agreement of December 26, 1884; that the legal effect of that agreement was a purchase by Porter directly from Crawford; that the amounts in controversy on these appeals are a part of the purchase price of the securities on such purchase of them by Porter, reserved by him to be paid either to Crawford or to the appellees; that the real controversy here is between Crawford and the First National Bank of Chicago on the one hand and the appellees

on the other; that the appellant had no interest in that controversy; that, by the purchase of the securities under the syndicate agreement, Porter was charged with full notice of all the facts from which the equities of the appellees against Crawford and the mortgage bonds arise; that the First National Bank acquired no better rights against the appellees, by the assignment to it of Crawford's interest in the syndicate agreement, than Crawford himself had; that the equities of the appellees to be paid the amounts due to them out of the fund in court are superior to those of Porter, as the nominal party, and to those of Crawford as the real party; and that Porter, by reason of his ownership and possession of over $700,000 of unpaid capital stock of the company, had no right, as against the appellees, to foreclose the mortgage for the benefit of his bonds until the claims of the appellees should first be paid.

The considerations which seem to us to show that the Circuit Court erred in awarding priority to the claims of these creditors over the mortgage bonds, are few and controlling.

The mortgages and the bonds are valid and binding as against the company; the company owes a large debt for the construction of its road, which is represented by the bonds; there was no bad faith, irregularity, deceit, or fraud in the execution of the mortgages or in the issuing of the bonds thereunder; the bonds in the hands of Porter represent actual values received by the company; they represent the entire purchase money that was paid for the Chicago and Block Coal railroad, extending south from Attica to Yeddo; they represent all the money that was paid directly by Drexel, Morgan & Co., through their agent, for the construction of the railroad north of Attica, a considerable portion of which money was paid to these five appellees; they represent all the money that was paid by Crawford out of his own means for the construction of the new railroad north of Attica; in fact, they represent all the money that has ever been paid by the company for the Chicago and Block Coal railroad and for the construction of the sixty miles of new road from Attica to Fair Oaks,

excepting only some $40,000 or $50,000 received from aid voted by townships.

To the objection, that, at the time the mortgage of November 1, 1881, was executed and the bonds were issued, Crawford owned the entire stock of the company and dominated the board of directors, and that the mortgage and bonds were issued under his dictation and coercion, even if such an objection could be legally tenable, it is a sufficient answer, that when the mortgage was made, and the $1,000,000 of bonds were issued and pledged to Dull and McCormick, Crawford was not a director or officer of the company. Foster was its president, and he and his associates constituted the entire board of directors, and they remained in full control until March 15, 1882. That this board was not dominated or controlled by Crawford is shown by the fact that when, on February 7, 1882, eleven days after Crawford had delivered in pledge to Dull & McCormick the $1,000,000 of bonds, Crawford asked the board to enter into a construction contract with him, and sent them a draft of the contract which he desired, the board unanimously rejected it. At the time the mortgage was executed, and at the time the bonds were issued and pledged to Dull and McCormick, Crawford held $50,250 par value of the stock, and Foster held $10,000 par value of it. The mere fact that Crawford owned a majority of the stock did not give him the legal control of the company; nor from such ownership can the legal inference be drawn that he dominated the board of directors. *Pullman Car Co.* v. *Missouri Pacific Co.*, 115 U. S. 587, 596.

The circumstances attending the issuing of the $1,000,000 of bonds show that they were issued by Foster and his board of directors in good faith, and largely for indebtedness of the company then existing. There is no foundation for the suggestion that the mortgage and the bonds were without consideration, nor does it lie in the mouths of these appellees to raise the objection as to the absence of a legal board of directors of the company; for, if the mortgage and the bonds are invalid for want of such legal board, and for want of the legal existence of the corporation, the contracts between these

appellees and the company, upon which their claims are based, are invalid for the same reason, and the consolidation by which the company procured the Chicago and Black Coal Company's road would be void, and that road would be free from all debts incurred by the Chicago and Great Southern Railway Company. Moreover, the directors were directors *de facto*, who held themselves out to the world as such, under such circumstances that their official acts bind the corporation and all persons who claim under it.

The claims of the appellees are for the original construction of the railroad. This is not a case where the proceeds of the sale of the property of a railroad, as a completed structure, open for travel and transportation, are to be applied to restore earnings which, instead of having been applied to pay operating expenses and necessary repairs, have been diverted to pay interest on mortgage bonds and the improvement of the mortgaged property, the debts due for the operating expenses and repairs having remained unpaid when a receiver was appointed. The equitable principles upon which the decisions rest, applying to the payment, out of the proceeds of the sale of railroad property, of such debts for operating expenses and necessary repairs, are not applicable to claims such as the present, accrued for the original construction of a railroad while there was a subsisting mortgage upon it. These five appellees gave credit to the company for their work. It was construction work, and none of it was for operating expenses or repairs, and none of it went towards keeping a completed road in operation, either in the way of labor or of material. When these claims accrued, the road of the company had not been opened for use. The claims accrued after the mortgage had been executed and recorded, and after $1,000,000 of the bonds secured by it had been issued and pledged to innocent *bona fide* holders for value. We are not aware of any well-considered adjudged case which, in the absence of a statutory provision, holds that unsecured floating debts for construction are a lien on a railroad superior to the lien of a valid mortgage duly recorded, and of bonds secured thereby, and held by *bona fide* purchasers for value. The authorities are all the other way.

On the facts of this case, the mortgage and the bonds are not affected by the existence of Crawford's construction contract, which was made on the 18th of March, 1882, after the issuing of the bonds and the pledging of them to Dull and McCormick. The amount of those bonds constitute the present value of the entire railroad property. By the construction contract, Crawford, in consideration of the bonds and stock which he was to receive under it, bound himself not only to complete, but to equip the road. The contract was not an unfair one. It was performed in part. Only $200,000 of the bonds were issued after the construction contract was made. At the date of that contract, Crawford was a large creditor of the company for money advanced by him and expended in construction. He had been advancing from his own means large amounts of money, and it was to reimburse to him the $300,000 or $400,000 of his own means already expended in the work, and to enable him to complete the payment for the Chicago and Block Coal railroad, and to proceed with the work of construction, that the $1,000,000 of bonds were issued to him. All the money received by the company for the bonds went into the property. The property produced by that money has never been worth what was expended in its production. From the date of the construction contract, the company was never able to issue or deliver a single bond under it, except by the consent of Dull and McCormick, or of Drexel, Morgan & Co., the parties who held the bonds and stock in pledge. The advances of money made by Crawford after the date of the construction contract were made without any security to him. Every bond issued after the date of the contract with Drexel, Morgan & Co. was required by that contract to be delivered directly to them, as additional security to them. Crawford realized no profits out of the mortgaged property, and never received anything for his services, or any reimbursement of the large sums of money he expended in this work. On these facts, it is impossible to see that the existence of the construction contract can have any bearing upon the case. Under any circumstances, no contract under which about sixty miles of railroad had been constructed would

be held invalid for the reasons assigned in this case, without the repayment to the contractor of the amount actually expended by him in good faith under the contract. *Thomas* v. *Brownville Railroad Co.*, 109 U. S. 522, 526.

Moreover, it is a well settled principle, that subsequent creditors cannot be heard to impeach an executed contract, where their dealings with the company, of which they claim the benefit, occurred after the contract became an executed contract. *Graham* v. *Railroad Co.*, 102 U. S. 148. The claims of all the appellees except the Cleveland Rolling Mill Company accrued after the construction contract was made. As to that company, it, after the construction contract was made, and while Crawford was carrying on the work of construction under it, knowingly received on account of its claims money which came directly from Drexel, Morgan & Co., as a result of the pledge of the bonds to that firm.

Dull and McCormick, Drexel, Morgan & Co., and Porter were respectively, in succession, purchasers in good faith of these bonds, as negotiable commercial securities, without notice of any irregularity or infirmity in them; and are entitled to the benefit of the principles applicable under such circumstances. Porter paid to Drexel, Morgan & Co. more than $392,000 in money for the bonds, and, under all circumstances, is entitled to protect his title by that of Drexel, Morgan & Co., and, through them, by the title of Dull and McCormick.

It is contended for the appellees that Porter did not purchase the bonds from Drexel, Morgan & Co., but bought them directly from Crawford. The evidence shows that Crawford, after January 27, 1882, the date at which he pledged the $1,000,000 of bonds to Dull and McCormick, never had one of those bonds in his possession or under his control. Dull and McCormick, not Crawford, delivered the bonds to Drexel, Morgan & Co., upon the payment to them by Drexel, Morgan & Co. of the debt due to them on account of the purchase of the Chicago and Block Coal railroad. The $200,000 of bonds issued after the negotiation of the loan from Drexel, Morgan & Co. were at once delivered to them, under their contract of pledge. This pledge vested in them the legal title to the

bonds, and Porter purchased that legal title from them. In opposition to this view, it is urged that the terms of the written agreement between Crawford and Porter of December 26, 1884, show that the purchase by Porter was from Crawford; but the true purport and effect of that instrument is, as before stated, a sale by Crawford to Porter and his associates of Crawford's right to redeem the bonds from Porter and his associates by paying the amount of money which Porter had paid to Drexel, Morgan & Co. By the contract of June 25, 1884, between Porter and Nickerson and Drexel, Morgan & Co., the former bound themselves to pay to the latter Crawford's debt to them, upon receiving from them the stock and bonds which they held as collateral to the debt. Nickerson assigned to Porter his interest in this contract, and Porter paid to Drexel, Morgan & Co. the amount of Crawford's debt to them, and took from them the bonds pledged to them by Crawford as collateral. By this transaction Porter became the owner of the legal title to the bonds, and was subrogated to all the rights of Drexel, Morgan & Co. in them. The contract of December 26, 1884, between Crawford and Porter, merely extinguished Crawford's right to redeem the pledged bonds. Under these circumstances, whatever it was that Porter purchased from Crawford, the former would, in equity, be subrogated to all the rights of Drexel, Morgan & Co., and, through them, to all the rights of Dull and McCormick.

Certain clauses in the agreement between Crawford and Porter of December 26, 1884, are cited as creating an equity or lien in favor of the appellees. By one clause in the agreement the syndicate represented by Porter agrees: "Second. To pay and clear off any and all claims against said Chicago and Great Southern Railway Company which may be decided by the court to be liens upon the said line of railway paramount to the lien of the bonds and coupons secured by the trust deed to said John C. New, dated November 1, 1881, or which the court may decide shall be equitably payable out of the proceeds of the sale of the said line of railway prior to any payment of the said bonds or coupons, including therein any and all claims for right of way and depot grounds, engine-house

and station buildings, water-tanks and shops, between Fair Oaks and Yeddo, both inclusive, bridges and other structures heretofore built and put in place on said railway, and essential to the operation thereof, but the title to which is not in said railway company, and which the court may decide must be paid for in preference to said bonds, and also any and all indebtedness incurred by the receiver in possession of said property prior to January 15, 1885, and not paid out of moneys earned by the operation of said road prior to January 15, 1885." By the same instrument, Crawford agrees as follows: " Section 5. The party of the first part hereby, in consideration of the premises, guarantees and agrees that the claims, liens, and other possible indebtedness mentioned in subdivision two, which shall be held to be prior in right to payment over said twelve hundred bonds and coupons, shall not in any event exceed the sum of one hundred thousand dollars ($100,000)."

These clauses do not create the lien or equity supposed. They leave the question as to the existence of any such " claims, liens, and other possible indebtedness," mentioned in the agreement, to be adjudicated by the court, and also leave to be decided by the court the question of the priority of such claims over the bonds, and merely provide for the rights of the parties as between themselves in case the court establishes such priority. As before said, the purpose of Crawford, in making the agreement of December 26, 1884, was to protect the second pledge of the bonds and stock to the First National Bank of Chicago, he having put into the construction of the railroad about $100,000 of the money which he had borrowed from the bank; and he immediately assigned to the bank all his interest in the contract with Porter. The contract between Porter and Crawford, and that between Crawford and the bank, having been entered into in contemplation of the purchase of the bonds from Drexel, Morgan & Co. by Porter, the legal relation of the appellees to the company and to its property, as unsecured holders of construction claims, was not affected by these transactions, so as to give them any greater rights against the mortgaged property than they had previously had. In any event, as before said, the bonds would be

sustained in the hands of Porter, as a first lien, to the amount actually advanced upon the faith of the pledge of them and expended in constructing the railroad, with interest. It is found by the final decree that there is now in court $325,194.27 derived from the sale of the mortgaged property. All the money advanced by Drexel, Morgan & Co. went directly into this property. The amount paid by Porter to Drexel, Morgan & Co., on January 12, 1885, was $392,363.24, exceeding by $67,168.97 the entire net proceeds in court, saying nothing about interest for over two years on the amount paid by Porter. This view is entirely conclusive of this case, and shows that there is no fund in court arising from the sale of the property that can upon any principle be held applicable to the payment of the construction claims of these appellees; and this is irrespective of the fact that, in addition, Crawford put into this property, in good faith, out of his own individual means, the further sum of $600,000.

It is contended, however, that Crawford was all the time substantially the owner of the entire railroad property, and that the claims of the appellees were debts due to them from Crawford for work and material in constructing his railroad, and that these claimants have a lien, in this way, superior to the lien of the mortgage bonds. In answer to this view, in addition to the suggestions already made, and treating Crawford as the owner of the railroad, it may be said, that the rights of Porter would be no different from his rights as dealing with the company as owner of the property. The delivery by Crawford of the bonds secured by a mortgage made by himself on the railroad, to a third person, for a valuable consideration, made the mortgage a valid security, and made the bonds in the hands of Dull and McCormick a valid lien on the railroad. An owner of a railroad, though he may be in debt to those who aid in constructing it by furnishing materials, may still execute a mortgage on it which will be good against unsecured creditors. No more than this was done, upon the theory we are now considering. The creditors would have no lien superior to the lien of the bonds. The mortgage was recorded, and the $1,000,000 of bonds were issued before the

claims accrued. It results from these views, that the entire purchase money now in court, arising from the foreclosure sale, after paying the costs and the receiver's indebtedness, should be paid out upon the bonds and coupons secured by the mortgage, in preference to the payment of the claims of the appellees, such net amount being less than the amount of money advanced by Drexel, Morgan & Co. on the pledge of the bonds and reimbursed to them by Porter.

It has been contended for the appellees, that the appeals by Porter now under consideration are appeals only from the decree of October 9, 1886; that he did not perfect any appeal from the decree of February 16, 1886; that the latter decree was a final decree; that the errors which Porter now insists on were errors committed in entering the decree of February 16, 1886; and that none of the errors now assigned can be considered by this court, because of the want of any appeal from the decree of February 16, 1886, and because the adjudications now complained of were made by that decree, and not by the decree of October 9, 1886.

It is a sufficient answer to these contentions to say, that the decree of February 16, 1886, though a final decree of foreclosure and sale as respected the interest of the mortgagor, and in some other respects, was not a final decree in respect of the matters involved in these appeals. The sixth clause of that decree merely provided that all unpaid, valid claims against the company for right of way, lands, labor, rolling-stock, and material used in the construction and betterment of the railway, were prior, superior, and paramount to the lien of the mortgages and the bonds; but determined nothing as to who were the holders of such claims, or as to what were their amounts. It designated no persons who could be appellees in any appeal by Porter in respect of such claims, and it provided for a reference to ascertain who were the several claimants under the sixth paragraph of the decree, and what were the amounts due to them severally. The first and only decree from which Porter could appeal, in respect of the claims of these appellees, was the decree of October 9, 1886. The sale made under the decree of February 16, 1886, was

not made subject to any claim of any of these appellees. An amendment of that decree, made on the 2d of March, 1886, prior to the sale, provided "that the sale of the property hereinbefore ordered shall pass to the purchaser a title thereto, free and discharged of all liens and claims, including the two classes of claims mentioned in the sixth paragraph of said decree." The question of the existence and priority of those claims is, therefore, one open for consideration on these appeals.

The various questions above stated as being raised by the appellees, which are not particularly adverted to, have been fully considered, and it is not regarded as necessary to further remark upon them, or upon the special points made in regard to the particular claims of the appellees, as the views on which we have rested the case seem to us to be controlling on those questions and points.

*The decree of the Circuit Court, made October 9th, 1886, is reversed, in so far as it decrees that the claims of the five appellees are prior, superior, and paramount to the lien of the mortgages or deeds of trust mentioned in the decree of February 16th, 1886, and of the bonds secured thereby; and in so far as it provides for the payment to the appellees, out of the fund in the registry of the court, of the several sums of money specified in the said decree of the 9th of October, 1886; and the case is remanded to the Circuit Court, with a direction to take such further proceedings as shall not be inconsistent with this opinion.*