FARMERS' LOAN & TRUST CO. v. STUTTGART & A. R. R. CO.
(BARSTOW'S EX'RS, Interveners).

(Circuit Court, E. D. Arkansas, W. D. February 21, 1899.)

1. RAILROADS—INSOLVENCY AND RECEIVERSHIP—PREFERRED LIENS FOR MATERIALS.

A guarantor of a debt contracted by a railroad company for rails, who pays the debt, has no greater claim in equity to a lien on the road superior to a prior mortgage than the seller of the rails would have if unpaid.

2. SAME—MATERIALS USED IN CONSTRUCTION OF ROAD.

There is no principle of equity recognized and applied in the foreclosure of railroad mortgages which entitles a debt contracted for materials used in the original construction of a railroad, which has been previously mortgaged, to preference over the mortgage as a lien on the road.

3. SAME.

A purchaser of notes executed by one railroad company cannot establish a lien therefor on the property of another, superior to that of a prior mortgage, merely because the maker used the proceeds in the construction of the second road.

4. SAME—TAXES ADVANCED BY AGENT.

One who, at the request of a railroad company, as its agent, pays taxes due on its property, is entitled to a lien thereon for the amount advanced superior to that of a mortgage.

This is a hearing on interventions by the executors of Amos C. Barstow, deceased, in a foreclosure suit against the Stuttgart & Arkansas River Railroad Company, claiming preferential liens on the property of the defendant, or the proceeds of its sale.

J. M. & J. G. Taylor, for complainant and interveners.

P. C. Dooley, for defendant.

John McClure, for receiver.

WILLIAMS, District Judge.   Three interventions are presented by the executors of the estate of Amos C. Barstow, deceased, which, for the purpose of hearing, have been treated as consolidated, whereby it is sought to charge the corpus of the railroad property, or the fund arising from its sale, with the payment of certain sums of money with a lien superior and paramount to that created by mortgage described in complainants' bill, notwithstanding the fact that the mortgage was executed and recorded prior to the time of the interveners' demands.

The first claim, it is alleged, arises out of an alleged contract of guaranty in relation to four notes executed by the defendant railroad company and Francis M. Gillett to the Illinois Steel Company for $1,650.65 each, payable, respectively, in 3, 6, 9, and 12 months from March 25, 1895.   These notes were executed by the railroad company and Gillett in payment for certain steel rails and fastenings to aid in the construction of defendant's railroad.   All of the notes have been protested for nonpayment, and there is nothing in the notice of protest which discloses that the steel company ever looked to any one else than the railroad company and Gillett for payment. The executors of the estate of Amos C. Barstow, deceased, claim to have paid the amount due on these notes to the steel company, and by virtue of this payment to be entitled, in equity, to a lien superior and paramount to that of the first mortgage, because the money so paid was for materials used in the construction of the defendant's railroad.   The master found in favor of the interveners in the sum of $6,602.62, with 6 per cent. interest from the 25th of March, 1895, and that they were entitled to a lien upon the property of the defendant railroad company, superior and paramount to the lien of the bondholders.   To this finding exceptions have been filed, wherein it is urged, among other things, that the master erred in declaring the holder of these notes to be entitled to a lien superior to the rights of those holding bonds secured by the mortgage.

In order to show (the notes being silent on the subject) how Barstow, deceased, came to be the holder of said notes, and the right of the executors of Barstow's estate to recover thereon, testimony was taken to show these facts, and the same is reported by the master.   It appears from this testimony that on the 25th of January, 1894, Amos C. Barstow, now deceased, entered into a contract with Francis M. Gillett whereby Barstow was to guaranty the payment of certain debts then contracted and thereafter to be contracted, not by the railroad company, but by Gillett, for the purchase of steel rails, fastenings, etc., to be used in the completion of the defendant and another railroad.   The fifth paragraph of that contract is as follows:

"Fifth. For and in consideration of the premises hereinafter mentioned, said Amos C. Barstow hereby further agrees for and during the period of two years from the date hereof to guaranty to an amount not exceeding in the whole guaranty herein agreed upon the total sum of $25,000, the bills contracted by said Gillett in the purchase of rails and fastenings and freight charges for carriage of the same. said guaranty being hereby made for no other purpose than on account of the purchase as aforesaid; and in consideration of this guaranty said Gillett agrees to deliver to said Barstow, as collateral security for all sums of money which said Barstow may be required to pay in consequence of said guaranty, with interest at the rate of six per

cent. per annum thereon, which said sum of money, with interest, said Gillett promises to pay to said Barstow within five years from the date hereof, twenty-five $1,000 bonds of the Pine Bluff and Eastern Railroad Company, as soon as the same can be legally issued by said company," etc.

As will be observed, this contract nowhere discloses an intention or undertaking on the part of Barstow to become a guarantor for the railroad company, or for the payment of any debts it might contract in the construction of its line of railroad. By this contract Barstow limits his liability to $25,000 and to "the bills contracted by the said Gillett in the purchase of steel rails, fastenings," etc. The Amos C. Barstow who made this contract of guaranty with Gillett departed this life, as the proof shows, some time in September of 1894, and therefore could not have been called upon in his lifetime to have guarantied the payment of the four notes executed to the steel company in March of 1895. It appears from the testimony of Amos C. Barstow, who is a son of Amos C. Barstow, deceased, and one of his executors, that at the time the contract was made for the purchase of the rails the steel company would not part with them unless payment of the notes was guarantied. He says:

"Before the steel company would furnish rails under said contract, they required an individual guaranty, and I offered them, personally, in Chicago, the personal guaranty of (myself) Amos C. Barstow and George E. Barstow, which offer they accepted."

In explaining why he gave the personal guaranty of himself and George E. Barstow, instead of their guaranty as executors of the estate of Amos C. Barstow, deceased, he says:

"Under the will of the late Amos C. Barstow, deceased, we could not give such a guaranty as was required, but we gave the individual guaranty, as above described, which was afterwards carried out by us as executors and trustees under the will of Amos C. Barstow, deceased, by paying the notes with the funds of the estate of said decedent."

It thus appears from the testimony of the executors of the estate of Amos C. Barstow, deceased, that under his will they could not, as executors, make such a contract of guaranty as was contemplated by the contract of January, 1894, between Amos C. Barstow and Gillett; that because they could not make a contract to bind the estate, they, as individuals, guarantied the payment of the notes, and took the money for that purpose out of the coffers of an estate they had no power to bind for the payment of these notes. Whether title to these notes could be obtained in this manner need not be discussed. It seems to me, under the testimony in relation to this claim, that, if it is to be prosecuted by any one, it should be prosecuted in the name of Amos C. Barstow and George E. Barstow as individuals, and not as executors of the estate of Amos C. Barstow, deceased. The mere fact that they took the money of their father's estate to pay an individual liability of their own, does not vest the title to these notes in the estate of Amos C. Barstow, deceased. A contract of guaranty is like every other contract in this: that there must be two or more parties to the contract, and to which the minds of the parties must assent. If the railroad company is to be held on a contract of guaranty, and the rights of parties secured under a mortgage are

to be made subservient to such contracts, then the existence of such contracts should be made to affirmatively appear.   There was no testimony before the master, nor is there any before the court, tending to show that Amos C. Barstow, deceased, ever contracted with the defendant railroad company to become a guarantor for the payment of any of its debts.   There is testimony showing an undertaking to guaranty the payment of certain debts that Gillett might contract for the purchase of steel rails and the like, and I am of opinion that the evidence does not disclose the existence of any other contract in relation to the payment of these notes.   But, if such a guaranty had been made, I do not see that the interveners would be in any better plight than they now are.   One who guaranties the payment of a note executed by a railroad company, whose property is already mortgaged, even though the note was executed in payment of steel rails, cannot, certainly, have any greater equity than he who furnishes the rails in the first instance.   Let us then inquire if the Illinois Steel Company could have enforced this claim, so as to have priority over the holders of the bonds secured by the first mortgage, which the bill was filed to foreclose.   It seems to me this precise question is answered in the case of Porter v. Pittsburg Bessemer Steel Co., 120 U. S. 667, 7 Sup. Ct. 741.   It appears from that case that the Bessemer Steel Company furnished steel rails for the original construction of a railroad, which had, before that time, executed a mortgage on all of its property.   The Bessemer Company intervened in the subsequent foreclosure proceedings, and sought to have its claim given a preference of payment over the holders of the bonds secured by the mortgage, on the ground that the material furnished went to the completion of the railroad, and made the security of the bondholder better.   The court below decreed that "the defendant [the Bessemer Company] had furnished materials which have been used in the construction and betterment of the railroad prior to the appointing of the receiver, and that such claim was superior and paramount to the lien of the mortgage and the bonds secured thereby."   From that decree an appeal was prosecuted to the supreme court of the United States, and in disposing of the question thus presented the court says:

"The claim of the appellee is for the original construction of the railroad. This is not a case where the proceeds of the sale of the property of a railroad, as a completed structure, are to be applied to restore earnings, which, instead of being applied to payment of operating expenses and necessary repairs, have been diverted.   The equitable principles upon which the decisions rest applying to the payment out of the proceeds of the sale of the road of such debts for operating expenses and necessary repairs, are not applicable to such claims as the present, accrued for original construction of a railroad, while there was a subsisting mortgage upon it.   It was construction work, and none of it was for operating expenses or repairs.   The claims accrued after the mortgage had been executed and recorded.   We are not aware of any well-considered case which, in the absence of statutory provision, holds that unsecured floating debts for construction are a lien on a railroad, superior to the lien of a valid mortgage duly recorded.   The authorities are all the other way."

The further citation of authority, to show the distinction between claims for original construction and those which grow out of operating the completed road and keeping the same a "going concern" is not

necessary. Where money arising from operating the road has been diverted, and applied to the payment of debts other' than such as came into being from the operating of the road, the courts have, in some instances, restored the diverted fund by taking an equal amount from the funds in the hands of the receiver. But this is not an instance where a fund has been diverted; on the contrary, it is a case where the material went into the original construction of the railroad after the execution and recording of the mortgage. There are cases where, as a condition precedent to the appointment of a receiver, the courts have required the payment of debts which accrued in the course of construction, but this is not a case of that kind. No order of that kind was made. The order made at the time of the appointment of the receiver is based on sections 6251, 6252, Sand. & H. Dig. Ark. It was not contended at the argument that the sections referred to covered the case of the interveners, but that it was within the general equity powers of a court of equity to give the preference asked. It follows that under the decisions of the supreme court in the Bessemer Steel Co. Case, the Illinois Steel Company could not have obtained a preference over the lien of the mortgage, if it were present and prosecuting this claim. It was probably for this reason that the steel company demanded and obtained a guaranty of payment before parting with its rails and fastenings. This being a claim for what is called "original construction" of the railroad, I am of opinion that it ought not to be adjudged a lien superior and paramount to that created by the mortgage described in the bill of complaint, and in that respect the exceptions are sustained, in so far as they apply to giving the amount due on these notes priority over the lien created by the mortgage in favor of the bondholders.

The second intervention is founded on two notes, not of the defendant company, but of the Pine Bluff & Eastern Railroad Company, of $2,500 each, payable six months after date to the order of Francis M. Gillett, with 6 per cent. interest. These notes are indorsed by Francis M. Gillett and Amos C. Barstow, now deceased, and Amos C. Barstow, the son of Amos C. Barstow, deceased, and George E. Barstow, and bear date July 10, 1894. Gillett, in giving a history of these notes and the various indorsements thereon, and how the same were obtained, says:

"Two notes for $2,500 each were made by the Pine Bluff & Eastern Railroad Company payable to the order of F. M. Gillett (myself), and were offered at various banks, and refused. Finally said notes were indorsed by Amos C. Barstow, but very soon afterwards (in September) Amos C. Barstow died, and that fact made it impossible for us to find any one who would discount them. So, finally, the estate of Amos C. Barstow discounted the notes. The proceeds of said discounts were paid to me as president of the road, and were expended for rails, freight, and construction work on said extension of the road."

At the time of this transaction, the mortgage now in suit had been executed and recorded. The only thing that connects the defendant company, if that may be so called, is that Gillett says he expended the proceeds of the discount of the Pine Bluff & Eastern Railroad Company for rails, freight, and construction work on the extension of the defendant's railroad. It thus appears that the

money was expended in the work of original construction. But, whether it was or not, the transaction was a simple borrowing of money upon commercial or business paper. It at best was an unsecured debt, not of the defendant company, but of the Pine Bluff & Eastern Railroad Company. A suit at law could not have been maintained against the defendant company by the payee named in the notes, or any of the indorsers thereon. It is, therefore, difficult to see how the amount of such notes can be declared a lien superior and paramount to that created by the mortgage in favor of the bondholders. The exceptions, so far as they relate to these notes, are in all things sustained.

The third intervention is for taxes upon the railroad of the defendant for the years 1891 and 1892, amounting in the aggregate to $3,100.82. These taxes were paid by a draft drawn by the secretary of the defendant company on George E. Barstow, who at that time was the president of said company. Shortly after the payment of these taxes, a bill was filed in this court by David Armstrong, receiver of the First National Bank of Little Rock, Ark., against the Stuttgart & Arkansas River Railroad, to enforce the payment of a judgment, and praying for the appointment of a receiver. Later on, the St. Louis National Bank filed a bill in this court against the defendant company, wherein the appointment of a receiver was also prayed; and, later on, Barstow filed a like bill, the object of which, among other things, was to have the taxes paid by him declared a lien. A receiver was appointed, and thereafter, by consent of all the parties, was discharged, with the reservation in the order discharging the same that, if the claims and demands against the defendant company were not paid off by a day certain, the court, at the instance of the holder of any of the demands presented in that suit or suits, would retake possession of the property of the defendant company. Before any attempt was made on the part of the creditors protected by the order referred to, the present suit was instituted. The taxes were a charge upon the corpus of the railroad, superior to the lien of the mortgage, and would have destroyed the security of the bondholders if the property had been allowed to go to sale. I think there is sufficient evidence in the record to show that the company made Barstow its agent for the payment of these taxes, and that he paid them, and thus preserved the interest of the bondholders.

It appears from the tax receipts that the total amount of taxes for the years 1891 and 1892 was $3,100.82, and from the other evidence that $250 was afterwards paid to Barstow; thus leaving due him the sum of $2,850.82. Upon the last-named sum he is entitled to interest at the rate of 6 per cent. per annum from May 20, 1893, and the same is declared to be a lien superior and paramount to that created by the mortgage, and the same is ordered to be paid out of the proceeds of sale.