GENERAL ELECTRIC COMPANY

*v.*

THE TRANSIT EQUIPMENT COMPANY, THE UNION TRAC-
TION COMPANY (William M. Johnson, receiver of each of
the foregoing companies), THE BERLIN IRON BRIDGE
COMPANY, THE STERLING COMPANY, THE PIERCE &
MILLER ENGINEERING COMPANY and THE METRO-
POLITAN TRUST COMPANY.

METROPOLITAN TRUST COMPANY

*v.*

THE UNION TRACTION COMPANY (William M. Johnson, re-
ceiver of the same), THE PIERCE & MILLER ENGINEER-
ING COMPANY, THE STERLING COMPANY, THE BERLIN
IRON BRIDGE COMPANY and CROCKER-WHEELER ELEC-
TRIC COMPANY.

[Decided December 19th, 1898. Filed June 10th, 1899.]

1. Motors, controllers and trolley poles belonging to an equipment company
are not so mingled with the car to which they are attached, belonging to the
railroad company, as to preclude the seller from maintaining a lien thereon
as against judgment creditors, where they are of standard make, and their
removal would leave the car ready to receive other equipments of similar
character.

2. An affidavit proving the signature of the president of a corporation to a
conditional contract of sale, and the affixing of the corporate seal, is a suffi-
cient compliance with the statute (*Gen. Stat. p. 2706*) requiring such con-
tracts to be "acknowledged."

3. The statute (*Gen. Stat. p. 891*) declares that an unrecorded conditional
sale of goods shall be void as against judgment creditors of the vendee; and
section 6 provided that every conditional contract of sale hereafter recorded
as required shall be valid as against creditors of the vendor, &c., from the
time of the recording.—*Held*, that a conditional contract of sale, which was
recorded before creditors had reduced their claims to judgment, was valid as
against them.

General Electric Co. v. Transit Equipment Co.

4. A mortgage covering after-acquired property of the mortgagor does not include chattels delivered to him under a conditional contract of sale.

5. An electric generator, weighing fifteen tons, resting on rails on a wooden platform on brick piers built from the earthen floor of a building, through the doors of which the generator may be taken, leaving the structure on which it rested intact, ready for the reception of a similar generator, is not a fixture enabling a mortgagee of the realty to claim it as against a vendor claiming title under a conditional sale.

6. A switchboard, consisting of a large metallic plate, set up on the side of a building, and affixed by spikes driven into a brick wall, on which is placed apparatus for the distribution of an electric current, is not a fixture enabling a mortgagee of the realty to claim it as against a vendor claiming title under a conditional sale.

Two causes tried together by consent.

The object of the first bill is to enforce a title reserved by the General Electric Company in certain electric motor-car equipments and controllers furnished and delivered by that company to the defendant the Transit Equipment Company and placed by it on certain street railway cars of the defendant the Union Traction Company, of which the defendant Johnson is receiver in insolvency, appointed by the Court of Chancery, and of which the defendants the Berlin Bridge Company, the Pierce & Miller Engineering Company and the Sterling Company are severally judgment creditors, and upon whose property the Metropolitan Trust Company is the holder of a mortgage.

The object of the bill of the Metropolitan Trust Company is to foreclose a mortgage which it holds upon all the property, real and personal, of the Union Traction Company, and the several judgment creditors above mentioned are made parties defendant by reason of their holding judgments, and the Crocker-Wheeler Electric Company is made a party defendant by reason of a claim which it sets up and manifests by a cross-bill of a title reserved to certain generators or dynamos, together with a switchboard and various other fixtures manufactured by it and delivered to the Transit Equipment Company and the Union Traction Company and placed in the power-house of the latter.

The only matters litigated up to this stage of the case are the

General Electric Co. v. Transit Equipment Co.

claims of the General Electric Company and the Crocker-Wheeler Company.

The case was heard on the pleadings and proofs in open court.

*Mr. William H. Corbin* and *Mr. Charles L. Corbin*, for the Metropolitan Trust Company.

*Mr. James B. Vredenburgh*, for the General Electric Company.

*Mr. Edward M. Colie* and *Mr. Noble* (of New York), for the Crocker-Wheeler Company.

*Mr. Charles D. Thompson*, for the three judgment creditors and for the bondholders secured by the mortgage.

*Mr. Eugene Stevenson*, for the receiver.

PITNEY, V. C.

The several claims of the General Electric Company and the Crocker-Wheeler Company are quite distinct—depend upon different facts—and so must be considered separately.

I will first take that of the General Electric Company, premising that the lien of the Metropolitan Trust Company, as trustee for the bondholders, is prior in point of time to that of either of the other parties.

The Union Traction Company was organized on the 2d of November, 1894, and shortly afterwards and in the same month the mortgage in question was made and executed, which also covered future-acquired property, the language used being " all property now possessed, *or which may be hereafter acquired*, by the " Union Traction Company.

The same persons who organized the traction company also organized the Transit Equipment Company, and by arrangement or contract between the two companies the Transit Equipment Company undertook to equip the railway. Later on, in executing that contract, it applied to the General Electric Company for certain car equipments, with the result that on or about the 9th

of November, 1896, a contract in writing was entered into be-
tween the General Electric Company and the Transit Equipment
Company for the furnishing of certain car equipments. That
contract was in the shape of a proposal and acceptance. The
proposal was made by the General Electric Company at its
Philadelphia office, and submitted on the 9th of November to
the Transit Equipment Company, to furnish certain equipments
mentioned in the part of the proposal called "specifications."
The greater part of the proposal is in a printed blank contain-
ing printed descriptions of the articles to be furnished, in which,
however, there are interpolated in typewriting some extras and
also some erasures and written interlineations. It is signed
by Mr. Mullen, the authorized agent and manager of the Gen-
eral Electric Company. At the foot of it is a printed accept-
ance in these words: "To the General Electric Company. The
proposal as above hereby accepted this twenty-fourth day of
November, 1896. Transit Equipment Company, by J. W. Gil-
more, President." In addition to that there is a special accept-
ance on a separate piece of paper, which was, however, attached
to the original proposal, addressed to the General Electric Com-
pany, in these words:

"Your proposal as contained in the foregoing instrument is hereby accepted
this twenty-fourth day of November, 1896. In witness whereof, the Transit
Equipment Company has caused its corporate seal to be hereunto affixed, and
its president to execute these presents for and in behalf of the corporation,
this twenty-fourth day of November, 1896. Transit Equipment Company, by
J. W. Gilmore, President. Witness—Gilbert T. Gale, Secretary,"

and the seal of the corporation. On the same day—November
24th—Mr. Gale, as secretary, made affidavit before a master of
this court, in the ordinary form, proving the signature of the
president and the affixing of the seal, and that it was so affixed
by the order of the transit company. This document was re-
corded in the clerk's office of Bergen county, on the 19th of
April, 1897, and in the office of the secretary of state, on the
7th day of May, 1897.

The proposal which forms the body of the contract contains
this clause:

"The title to the apparatus herein sold shall not pass from the company until all payments hereunder, including deferred payments, if any, shall have been fully made in cash. The purchaser agrees to do all acts necessary to perfect and maintain such retention of title in the company."

In the first part of the proposal it is provided that the General Electric Company is thereinafter to be called the "company."

The contract provides for the delivery of the articles as required by order. The equipment company did not order all the articles at once or at all, but the first of the deliveries was made in the latter part of the month of April, 1897. The first bill of lading from the factory of the company was dated the 22d of April, 1897, and reached the premises of the Union Traction Company on one of the last days of April, and on one of the first days of May the agent of the electric company attended at the premises of the Union Traction Company and applied the articles to the trucks and cars of the latter company.

The apparatus consists mainly of the "motors" attached to each of the trucks or running-gears of the cars, and the "controller" attached at each end of the car, and a "pole" upon the top of the car. There were two motors and two controllers to each car. To each one of these articles the name of the General Electric Company was fastened on a brass plate, in strict accordance with the terms of the third subdivision of the act of March 8th, 1883 (*P. L. of 1883 p. 87*), as amended by the act of March 5th, 1895 (*P. L. of 1895 p. 158; Gen. Stat. p. 2706*). The act of 1883 is entitled "An act relating to certain contracts for the lease or conditional sale of railroad equipment and rolling stock and providing for the record thereof," and provides, *first*, that contracts for the leasing or conditional sale of railroad equipment and rolling stock shall not be valid as against

"any *subsequent* judgment creditor or any *subsequent* purchaser for a valuable consideration without notice unless the same shall be evidenced by writing, duly *acknowledged* before some person authorized by law to take acknowledgments of deeds;"

*second*, that it shall be recorded in the office of the recorder of deeds of the county in which is located the principal office or place of business of such vendee.

General Electric Co. *v.* Transit Equipment Co.

*Third.*. Each locomotive or car so sold, leased or loaned shall have the name of the vendor, lessor or bailor, or the assignee of such vendor, lessor or bailor, plainly marked upon both sides thereof, followed by the word owner, lessor, bailor or assignee, as the case may be."

By the amendatory act of 1895 the act is extended to street railway equipments, and the contract is to be recorded in the office of the secretary of state whenever the railroad company is operating in more than one county.

The third condition above recited remains unchanged.

By a new section, provision is made that the provisions of the act entitled "An act requiring contracts for the conditional sale of personal property to be recorded," approved May 9th, 1889, shall not be construed to apply to railroad and street railway equipment and rolling stock which shall be the subject of contracts of the kind specified in the first section of the act relating to railroad equipment.

Two objections are made to the enforcement of the claim of the General Electric Company. First, that the articles sold are so mingled with other property of the Union Traction Company that they cannot be separated from such other property.

I think the evidence does not sustain this objection. The trucks and bodies of the railway cars were originally made and designed to be propelled by electricity, and by apparatus of the kind here provided by the electric company. No particular alteration or cutting was required in order to attach the apparatus provided by the electric company to those cars, and the articles so furnished are each still distinct and may be removed. The essential quality of neither the motors nor controllers on the cars is changed by the annexation, and when removed each will have its own distinct existence and quality. The motors and controllers are of a standard make, such as may be applied to any street railway car, and their removal will leave the street railway cars and trucks ready and fit to receive other equipments of the same character and of the same value in all respects as if they had never been attached. I see no substantial difficulty in removing them.

The second objection is that the statute with regard to railway

30

equipment requires that the contract shall be acknowledged before being filed, and that the contract in question was not acknowledged, but proven.

It was suggested, and I think rightly, that the language of the act, which is peculiar in that respect and varies from other acts of like nature on our statute-book, was copied from some statute of another state, and the words "or proven" left out by inadvertence. Be that as it may, I think that the word "acknowledged" is broad enough to cover and include proof by witnesses. It is well known that the regular common-law mode of establishing *ex parte*, for purposes of registration, the execution of a deed by a corporation was to prove it by an officer of the corporation in precisely the manner in which this contract is proven, and that the machinery of an acknowledgment was seldom resorted to, and its validity when resorted to was not approved by the profession until the decision of the court of errors and appeals in the case of *Hopper* v. *Lovejoy, 2 Dick. Ch. Rep. 573,* which was announced at the November Term, 1890. The act in question had its origin in the year 1883, when the general sentiment of the profession was, as I have said, that the execution of a deed by a corporation must be proven and not acknowledged. And it seems to me that the force of the word "acknowledged" in this act must be determined in view of the state of the law, to which I have called attention. It is difficult to believe that the legislature intended to exclude a mode of authentication universally recognized by the profession as the proper one and substitute therefor one of doubtful value. I think that proof of the execution of a deed by a corporation according to the common law is to all intents and purposes an acknowledgment of the deed in the sense in which that word is used in the act, and that the objection fails.

But, in the next place, the strength of the objection depends entirely upon the assumption that the apparatus supplied here is within the purview and meaning of the act of 1883 as amended by the act of 1895. Taking the act altogether, it seems to me to be a serious question, which, however, I do not find it necessary to decide, whether or not these appliances are "equip-

General Electric Co. v. Transit Equipment Co.

ments" such as are within the purview of the act. The third condition, with regard to the placing of the names on each of the "*said locomotives and cars*," indicates that it did not apply to mere attachments to a car. If the apparatus here in question is not within the act of March 5th, 1895, then it comes within the Conditional Sale act of 1889 (*P. L. of 1889 p. 421*), as amended by the act of March 14th, 1895 (*P. L. of 1895 p. 302; Gen. Stat. p. 891*), the terms of which include "proof" as well as the "acknowledgment" of contracts, and the other provisions of which have been complied with by the electric company.

I think the General Electric Company is entitled to relief.

Next, the case of the Crocker-Wheeler Company.

That company, on the 21st of August, 1896, entered into a written contract, *inter partes*, with the Union Traction Company and the Transit Equipment Company for the furnishing to those companies of "three standard types of belt-driven railway [electric] generators," of a particular but standard fashion and strength, with fittings and cables for connecting the generators to a switchboard, also a switchboard connected therewith.

The contract contained a clause

"that the title to the generators and other apparatus shall not pass from the said electric company to the said transit company or to the Union Traction Company until the same is fully paid for in lawful money of the United States as herein agreed,"

with a right to enter on the premises and remove the same or any part thereof.

The three generators and switchboard were duly installed in the power-house of the traction company some time after the making of the contract, but in complete compliance with the terms of it; and some time afterward, to wit, on the 26th of August, 1897, the contract was duly recorded in the office of the clerk of Bergen county, and such record was prior to the recovery of either of the judgments of the three judgment creditors, which were recovered two months later, while the receiver was appointed in January, 1898.

The first question presented by these facts is as to whether or not the Crocker-Wheeler Company lost any rights by failing to record its contract for so long a time.

The question of failure to record arising under the Chattel Mortgage act was elaborately discussed and thoroughly considered and settled in the case of *Meding* v. *Roe, 8 Dick. Ch. Rep. 350,* and it was there held that both the language and policy of the Chattel Mortgage act required that the mortgage should be recorded immediately, and if not so recorded it was void as to all existing creditors and such as became creditors at any time before the recording of the mortgage. So far as this result depended upon a matter of construction, it was held, both in this court and in the court of errors and appeals, that the word "immediate," in the fourth section of the Chattel Mortgage act, extended not only to the change in the possession of the articles mortgaged, but also to the recording of the instrument, and Mr. Justice Van Syckel, in speaking for the court (at *p. 368*), says: "I agree with the vice-chancellor that the force of the word 'immediate' extends throughout the sentence, and applies to the filing or recording as well as to the delivery of possession."

By the ninth section of the Chattel Mortgage act it is provided that every chattel mortgage thereafter recorded shall be valid against the creditors of the mortgagor and against subsequent purchasers and mortgagees, from the time of the recording thereof; and it was held that the effect of that clause was that the chattel mortgage was good as against all creditors who did not become such before the recording of the mortgage.

But the language of the fourth section of the Chattel Mortgage act declares that failure to record immediately renders the mortgage "absolutely void as against the *creditors* of the mortgagee," and therein varies from that of the Conditional Sale act, as well as from the Real Estate Mortgage act, which latter declares that a mortgage

"shall be void and of no effect against a *subsequent judgment* creditor, or *bona fide* purchaser, or mortgagee for a valuable consideration, not having notice thereof."

General Electric Co. *v.* Transit Equipment Co.

Now the language of the Conditional Sale act—resembling that of the Real Estate Mortgage act—declares that in every contract for the conditional sale of goods and chattels accompanied by actual delivery and continued change of possession, all conditions and reservations which provide that the ownership of such goods and chattels is to remain in the person contracting to sell until the articles are paid for, "shall be absolutely void as against the *judgment* creditors of the person so contracting to buy the same, and *subsequent* purchasers and mortgagees thereof in good faith."

This use of the words "judgment creditors" instead of "creditors," distinguishes it from the Chattel Mortgage act and shows that the act was not made for the benefit of concurrent creditors at large, but only for judgment creditors and subsequent *bona fide* purchasers who become such before the record of the contract; for the act in question has in its sixth section a provision almost precisely similar to that of the ninth section of the Chattel Mortgage act, namely : "That every contract of sale hereafter recorded pursuant to the provisions of this act shall be valid against the creditors of the person contracting to buy and against subsequent purchasers and mortgagees, from the times of the recording thereof until the same be canceled of record," &c.

The utmost that could be claimed in behalf of the judgment creditors in this case would be that, by analogy to the case of *Meding* v. *Roe*, creditors who become such after the delivery of the machines upon the grounds of the traction company and before the recording of the contract, should be protected. But none such were shown in this case, and, in my opinion, if there had been, their claim would not be protected by the language of the act. This limitation of the benefit of the act to judgment creditors disposes of the claim of the receiver, who can have no higher standing than that of a judgment creditor.

The next question is as to whether or not the reservation of title in this case can be effectual against the mortgage of the Metropolitan Trust Company, which by its terms covers all property of the mortgagor, the Union Traction Company, "now possessed or which may be hereafter acquired by " that company.

And the first question is whether this is after-acquired property, and if not, second, whether it can be held under the mortgage by reason of its having become a fixture, and so by conversion a part of the freehold.

Now, as to the first claim, it seems to me too plain for argument. The mere statement of the case shows that the mortgage cannot prevail, for, in point of fact, this property never was "*acquired*" by the traction company, the mortgagor. When furnished it was a chattel, and for the purpose of the present argument we must treat it as still a chattel, and if the title never vested in the traction company then the property never was acquired by the traction company and never became subject to the mortgage. In other words, the acquisition of the title to it by the mortgagor was a condition precedent to its becoming subject to the mortgage.

The second question is whether it became so affixed to the freehold as to come under the dominion of the mortgage as a part of the real estate.

Now, going back to the leading case in New Jersey (*Brearley* v. *Cox, 4 Zab. 287*), and coming down through *Blancke* v. *Rogers, 11 C. E. Gr. 566; Penn Mutual Life Insurance Co.* v. *Semple, 11 Stew. Eq. 575; Speiden* v. *Parker, 1 Dick. Ch. Rep. 292; Feder* v. *Van Winkle, 8 Dick. Ch. Rep. 370,* to *Lee* v. *Hubschmidt Building, &c., Co., 10 Dick. Ch. Rep. 623,* we find the question of fixture or no fixture, as between mortgagee and the creditor of the mortgagor, to depend mainly on three elements—*first,* the actual annexation to the freehold; *second,* the application of the chattel to the use or purpose to which the part of the realty with which it is connected is appropriated, and *third,* the intention of the parties making the annexation to make a permanent accession to the freehold. And where the actual annexation is but slight and the question is as to an article which is capable of an actual separate existence and of being moved and used in some other place, and its removal will work no material injury to the freehold, the prevailing element is one of intention. I so found it in the case last cited—*Lee* v. *Hubschmidt.* See *Ewell Fixt. (ed. of 1876) 21, 23, 39, 42, 43.*

Now let us see how the principles alluded to apply to this case.

The building in which the machines were erected and are at present found is a large barn-like structure, which comprises under one roof a car-barn and a power-house, including steam-boilers and engines for power and the machines in question.  The place was prepared for the machines without touching the structure proper by simply building up solid brick piers from the earth to the proper level, of a size sufficient to bear the weight of the machines, which is about fifteen tons each.  Upon those brick piers was fastened to each a wooden platform.  This was all done by the Union Traction Company, and the same forms no part of either the building or the machines, but simply a foundation and bed upon which the latter rest.  The removal of the machines will leave those foundations uninjured and undisturbed and ready at once for the reception of other machines of the same size and character.  The actual annexation is effected by simply placing upon the wooden platform certain iron rails and fastening them thereto with ordinary screw-bolts penetrating the wood.  On those rails, which are called " shears," the machines are placed and so arranged that they may be moved slightly in a direction corresponding with the direction of the belts by which they are driven, so that when the machines are not in motion certain set-screws may be loosened and the machines moved along on these iron rails or shears in such a manner as to tighten the belts and thus save the labor and expense of cutting them and shortening them every time they become a little too loose to be efficient.  The door of the building is large enough to permit their removal without injury to the structure.

So much for the three machines.

With regard to the switchboard, that is a large metallic plate set up on one side of the building and affixed by bolts or spikes driven into the brick wall, and upon it are placed all the apparatus by which the electric current is distributed.  That, too, may be removed without any serious injury to the building; is in itself a complete instrument and may be set up in another building and used for the same purpose as it is used there.

There is nothing, then, in the annexation which would make these articles fixtures against the will and intention of the parties. As between landlord and tenant, no respectable argument could be made in favor of the position that the tenant would not have the right to remove them. The general right of removal on the part of a tenant includes many objects much more securely fixed to and thoroughly incorporated with the real estate than those here in question.

In respect to annexation the case resembles that of *Lee* v. *Hubschmidt, supra*, and the cases there cited, and upon the question of intention there can be no doubt but that, as in *Lee* v. *Hubschmidt*, the machines were placed as they were with the intention of making them a part of the freehold, and, moreover, they come in under the second element above mentioned, viz., their application to the use or purpose to which the realty with which they are connected is appropriated. The building was designed for the purpose of receiving these various machines or others similar thereto, and the whole purpose and object was to establish an electric power plant for the purpose of propelling the cars of the traction company, thereby making one system.

But that adaptability and that purpose and intention, it seems to me, must be held subject to the lack of right and power of the party to make the application and carry out the intention to make an addition to the freehold. It seems to me that it is an essential part of an efficient annexation of a chattel of this character and its resultant conversion, that the chattel shall be the property of the person who performs the act of annexation, or that the purpose of annexation shall be acquiesced in by the owner of the property. The intent and purpose of the mortgagor in the act of annexation must be accompanied with the power to do it, arising out of either the ownership of the chattel or the consent of the owner thereof. And here we encounter the element of the hardship and injustice of taking one man's property, without his consent, to advance the pecuniary interests of another. It was the hardship and injustice in this respect of the old law of fixtures which led to its modification in favor of the tenant against his landlord.

If the case were *res nova*, I should be of opinion, on general principles, that the right of the owner of the chattel, under present circumstances, should prevail. It is impossible, under the evidence, to charge the owner with having consented that the chattels should become a part of the freehold. The contract itself, which contains not only a reservation of the title but also a right to remove them from the premises, forbids the idea of such consent. In fact, as it appears to me, the maker's right in this case is quite as perfect as it would have been if there had been no provision for a sale and a passing of the title on payment, but that instead of a sale the machines had been rented and delivered on a bailment of hire to the traction company. Upon such a bailment it seems to me that it would be contrary to fundamental principles to say that the owner had consented that the chattel should be converted into freehold and subjected to a mortgage upon the premises. Nor does the case present any features requiring such a forced inference from the contract and the action of the parties. The fact that equipments of all sorts are let out on a bailment of hire is so common and so well known that no one can be misled by it.

But I think that the question is *res adjudicata* in New Jersey, and is covered by the case of *Campbell* v. *Roddy, 17 Stew. Eq. 244,* which is a decision of the court of errors and appeals. The syllabus of that case is this:

"A vendor of an engine, boiler and machinery, knowing that they were to be annexed to real estate, took a chattel mortgage upon them for a part of the price, but failed to register it. The mortgagor of the chattels afterwards annexed them to real estate upon which he had already given a mortgage.— *Held*, that the lien of the chattel mortg ge should be protected, so far as it would not diminish the security which the real estate mortgagee would have had if the annexation had not been made."

The machinery there, as appears by the report below, in *15 Stew. Eq. 218,* was one large steam crane, one jack, *one steam engine and boiler*, one large lathe, one small lathe, one planer, one drill press, one drill upright, one Mackenzie blower, two small pumps; *shafting*, belting, &c.; one large truck scale, one wire rope and drum, one jig-saw and stand, one pair of bellows,

two anvils, one large anvil, one iron hoisting-block and chain, &c., machinery for operating an iron foundry and pipe factory. The description, in *15 Stew. Eq. 223,* of the mode in which they were attached to the land shows that they were annexed with much greater thoroughness than the machines here in question. In that case the sale was absolute, and a chattel mortgage was taken back, so that there was a passing of the title with a retention of a lien only.   Here there is a retention of the title itself, so that the argument from that case to this is *a fortiori.*

The reasoning of the learned judge who spoke for the court of errors and appeals is exhaustive of the whole subject, leaving nothing to be said, and I should have simply referred to that case as authority but for a recent decision of the federal court, relied upon by the receiver.   I refer to the case of *Phœnix Iron Works Co.* v. *New York Security and Trust Co.,* decided December 7th, 1897, in the circuit court of appeals, sixth circuit, and reported in *54 U. S. Cir. Ct. App. 408* (West Publishing Company), and in *83 Fed. Rep. 757* (reported below in *77 Fed. Rep. 529*).   It is not exactly in point, but nearly so, the machinery there being an engine, stack, boiler, pump, &c., constituting the steam plant and furnishing the power which created the electricity for the railroad.   It is manifest at once that the annexation of a steam-power plant is much more thorough and extensive than that of the machines in this case.   But the reasoning of the court would, I think, include this case.

In the opinion the court put itself upon the authority of the following cases : *Dunham* v. *Railway Co., 1 Wall. 254; Railroad Co.* v. *Cowdrey, 11 Wall. 459 ; United States* v. *New Orleans Railway Co., 12 Wall. 362 ; Dillon* v. *Barnard, 21 Wall. 430; Fosdick* v. *Schall, 99 U. S. 235 ; Porter* v. *Steel Co., 120 U. S. 649,* and again in *122 U. S. 283 ; Thompson* v. *Railroad Co., 132 U. S. 68,* and *Railroad Co.* v. *Hamilton, 134 U. S. 296.*

Before examining those cases, which I propose to do presently, I will notice the ground outside of authority upon which the court put itself, which is that announced in the case of *Porter* v. *Steel Co., 122 U. S. 283,* to wit : " It is well settled, in the decisions of this court, that rails and other articles which become

affixed to, and a part of, a railroad covered by a prior mortgage, will be held by the lien of such mortgage in favor of *bona fide* creditors, as against any contract, between the furnisher of the property and the railroad company, containing stipulations like those in the contracts in the present case [reserving title]." And the circurt court of appeals held that there was no distinction between the kind of property there mentiond and stationary machinery such as a steam engine and boiler there in controversy.

In the report of the case in *77 Fed. Rep. 529*, it appears that the judge below put the decision on the ground that the furnisher of the boiler and engine had consented to the conversion of those machines from personalty to realty, and this was approved by the court of appeals, and both courts gave the furnisher a lien upon the articles furnished, subject, however, to the superior lien of the mortgage. How that result could have been effected consistently with the well-settled principles upon which courts act in such cases I am unable to perceive. It was distinctly held in some of the federal cases on which the court in *Phœnix Iron Works* v. *Trust Co.* relied, as well as in the case of *Campbell* v. *Roddy*, that a mortgagee of after-acquired property takes that property subject to all liens that were upon it, and when the circuit court of appeals, in the case just cited, held that the furnisher of the boiler and engine had a lien upon them, but failed to give that lien preference over the first mortgage, it seems to me that it went directly counter to the decisions of the supreme court of the United States.

But let us examine the cases above cited.

The case in *1 Wall.* (*Dunham* v. *Railway Co.*) was that of a contractor for a particular part of a railway, where the company defaulted in making its payments and contracted with him that he should finish the part and hold possession of and operate it until his debt was paid, the property being subject to a prior mortgage which covered after-acquired property, and the court held that the contract between the company and the contractor was not sufficient to divest the title of the mortgagee. The difference between that case and this is apparent.

The case in *11 Wall.* (*Railroad Co.* v. *Cowdry*) was between

prior and subsequent mortgagees, where the subsequent mortgage was given to raise money specially to finish the railroad, and it also dealt with a claim by the man who furnished the iron for a part of the road. He did not claim the right to take away the rails, but to have a prior lien for their value. There was no reservation of title.

In the case in *12 Wall.* (*United States* v. *New Orleans Railway Co.*) the result was favorable to the superior lien of the vendor of chattels, which consisted in that case of rolling stock. The principle was laid down by Mr. Justice Bradley (at *p. 365*), as follows: "A mortgage intended to cover after-acquired property can only attach itself to such property in the condition in which it comes into the mortgagor's hands. If that property is already subject to mortgages or other liens, the general mortgage does not displace them, though they may be junior to it in point of time. It only attaches to such interest as the mortgagor acquires."

The case in *21 Wall.* (*Dillon* v. *Barnard*) is a mere reiteration of *Dunham* v. *Railway Co., 1 Wall. 254.*

*Fosdick* v. *Schall* (*99 U. S.*) is a reiteration of *United States* v. *New Orleans Railway Co.* (*12 Wall.*), and these cases constitute the authority upon which Mr. Justice Reed relied in the case of *Campbell* v. *Roddy, supra,* and sustained the prior lien of a vendor of rolling stock of a railroad. The contract for sale in *United States* v. *Railroad Co.* was precisely like that in the present case; and see *Daly* v. *Railroad Co., 10 Dick. Ch. Rep. 595,* affirmed on appeal.

The case of *Porter* v. *Steel Co.* (*120 U. S.* and *122 U. S.*) was an attempt to establish a lien upon a railroad, or rather the proceeds of its sale, for certain materials furnished, and did not involve a claim of a right to enforce a reserved title to machinery or chattels, and, as stated at the rehearing, it appeared that the claim arose upon certain bridges built for the use of the railway. The building contractors had reserved the right to remove the bridges if not paid for, and the question was whether, under that reserved right, the bridge builders were entitled to a prior lien on the fund in court, proceeds of the sale

General Electric Co. v. Transit Equipment Co.

of the road, for the value of the bridges.    Held they were not.
And then follows the statement of the principle applying to
such cases, previously cited.    The difference between a bridge
and the property now in question is apparent.

*Thompson* v. *Railroad Co.* (*132 U. S.*) is like the case reported
in *1 Wall.*

*Railroad Co.* v. *Hamilton* (*134 U. S.*) was the case of a dock
on the Maumee river, in the city of Toledo, and the claim of
priority there was not by reason of reserved title in the mate-
rials of the dock, but, first, under the Mechanics' Lien law of
Ohio, and second, an equitable right arising from the construc-
tion of the dock and consequent improvement to the railroad
company.    The claim was for priority of payment out of the
proceeds of the sale of the railroad.    Held that it could not be
allowed, on the principle of *Dunham* v. *Railway Co., 1 Wall.*
*254.*

This review of the authorities seems to me to show that they
do not sustain the decision of the circuit court of appeals in the
case relied upon of *Phœnix Iron Works* v. *New York Security and*
*Trust Co., supra.*

The court, in the latter case, declared in substance that the
case did not turn upon the question of conversion of personalty
into realty, but, with great deference, I am of the opinion that
it did and that there was no conversion.

For these reasons I think that the claim of the Crocker-
Wheeler Company must prevail.

The question remains how the right of these parties shall be
enforced.    Upon that I will hear counsel.