**TEXAS CO. OF MEXICO, S. A., v. ROOS et al.**

**ROOS v. TEXAS CO. OF MEXICO, S. A., et al.**

No. 5245.

Circuit Court of Appeals, Fifth Circuit.

Sept. 3, 1930.

Rehearing Denied Sept. 27, 1930.

4

T. J. Lawhon, of Houston, Tex., Howard Templeton and S. J. Brooks, both of San Antonio, Tex., and C. B. Ames, of Oklahoma City, Okl., for Texas Co. of Mexico, S. A.

R. L. Batts, of Austin, Tex., and J. B. Lewright, of San Antonio, Tex., for Edward Roos.

Thos. B. Blanchard, of Houston, Tex., and Claude V. Birkhead, of San Antonio, Tex., for Lane, Wolters & Storey.

Before BRYAN and FOSTER, Circuit Judges, and GRUBB, District Judge.

BRYAN, Circuit Judge.

We come now to dispose of the various contentions of the parties.

As to the accounting. In our opinion the contract as written did not confer upon the Mexican company, as assignee of Brooks, the right to take over the oil and account to Roos on the basis of its value at the wells. In several places the contract speaks of accounting for all oil produced at the prices realized upon sales, but never once of an accounting upon any other basis. Besides, all net profits were required to be distributed in proportion to the shares of the parties interested. The inference is clear that the oil was to be sold in solido for the benefit of all parties concerned. It is argued that the clause which provided for the "marketing of all products obtained" conferred a right and not a duty; but, if so, it was a right coupled with a duty, because good faith and due diligence were required to be exercised in marketing. The contract could not be varied by contemporaneous parol evidence of the understanding of the parties. Nor was proof of custom in the absence of express agreement material, for the contract construed as a whole affirmatively imposed the duty to sell. There was no market for oil at the wells. Such sales as occurred there were not made by independent sellers to independent buyers, except that occasionally oil was exchanged, sold, or bought by a producer to meet an emergency. In the main, sales at the wells were made by subsidiary to parent companies. No prudent unhampered owner would voluntarily have sold his own oil at the well mouth, because the prices obtainable there were controlled by the purchasers, and there was an available market within easy reach. The contract was silent as to the place of sale, but it became the duty of the Mexican company, in the exercise of that good faith and due diligence which it had assumed, to seek to obtain the reasonable value of the oil. It is conceded that such value was not obtainable at Tepetate, or elsewhere in the oil field.

Port Lobos was the nearest available market, and the oil would have been taken there for sale by a prudent owner, or by one performing the duty of exercising reasonable care to realize its fair value. Port Lobos was not a standard market in the sense that there were posted prices at which oil could always be immediately bought and sold, but frequent sales, from which values could be determined, were made there. It is frankly conceded by the Mexican company that if it rested under the duty to sell at Port Lobos and reasonably could have sold for the prices found by the master and approved by the court, it should have done so. But it is argued that in arriving at market values the master adopted, and the court approved, the wrong method, in that such values were determined by using arbitrary periods; that the method so adopted and approved was not correctly applied, because the average market price for a given period was based upon the number of sales contracts, whereas it should have been calculated upon the number of barrels. The periods were not arbitrary, but were changed to keep up with the rapid fluctuations in prices. It may be conceded that under some circumstances the number of barrels sold should be considered in arriving at the average price. But all the sales in question here involved large quantities of oil, and the difference in prices does not seem to have been dependent upon the quantity sold. It therefore was proper to calculate the average price upon the basis of the number of sales contracts; and a calculation based upon the number of barrels would have been unfair, because a sale involving the greatest number of barrels, though the mere size of the sale was without influence on the market, would have shown a less average price than was realized upon smaller but substantial sales. It is not necessary to hold that all sales should have been made on a spot market; for it may very well be that a sale at a price, reasonably close to the market value, for future delivery would be permissible. We are concerned with only one contract for future delivery, and that was made to the Metropolitan Company. That contract was made at Tepetate, where admittedly there was no market, much below the market price obtainable at Port Lobos. Besides, in making deliveries under it, 80 per cent. of the total production from the Obando lease was used, whereas only 25 per cent. of the total production was taken from wells

which were owned exclusively by the Mexican company. In this way the Mexican company threw an undue burden of a losing contract on Roos, freed its own oil practically to the full extent possible, and made it available for sale at more favorable prices. We think the trial court was right in refusing to sanction this sale. The Mexican company was bound to account to Roos for his share of the net profits. The minimum requirement to sell at the best price which reasonably could be obtained cannot be used by it as an excuse for taking advantage of and profiting by sales which were made above the market. Under the contract the Mexican company was entitled to interest at 6 per cent. on operating expenses. The cost of transporting through the pipe lines was clearly an operating expense; but, on the theory that it was not so treated or considered by the parties at interest, the Mexican company contends that it was entitled to interest at 25 per cent. because of the uncertain and hazardous nature of its investment. Although the company so interpreted the contract as to relieve itself of the obligation to market oil, certainly Roos did not agree to such interpretation.

And so there did not exist the practical construction insisted upon. But when the duty of transporting the oil to Port Lobos was imposed, of course it became necessary in determining net profits to deduct the cost of transportation to place of sale. The Mexican company was therefore entitled to recover the actual cost of transportation, together with interest at the contract rate.

Upon proof of such cost, the usual or customary charge was immaterial. If, however, actual cost was not satisfactorily shown, it was not error to accept the customary charge as the only fair and reasonable measure of compensation shown by the evidence. The Mexican company's method of keeping its books made it difficult to calculate with accuracy the cost of transportation. Those books did not purport to show such cost, as was admitted by the company's general manager and accountant, but a consolidated investment account was kept, and hence it became the task of experts to segregate and make apportionments, with the result that at last only an estimate could be or was given. It so happens, as we understand the evidence, that there was only a slight difference between the customary charge and the estimated actual cost.

That difference becomes negligible upon consideration being given to inaccuracies inherent in the attempted apportionment and in the bookkeeping method adopted of treating unascertained general and departmental overhead expenses as capital investment. After deducting the 20 per cent. salvage estimated by Corry, the total investment claimed at the end of 1919, by which time all the equipment which was of any use to the Obando lease had been installed, amounted to $2,406,800; and the total investment claimed as of July 31, 1921, amounted to $4,907,538, the increase being made up of investments for pipe line in new territory and of improvements at the Agua Dulce Works for the benefit of the refinery. For purposes of comparison, and in order to avoid unnecessary repetition of figures, we shall assume that the total investment at the end of 1919 was half that of July 31, 1921, that the total production was 30,000,000 barrels, that there was an equal production in barrels as between the original pipe line territory and the new pipe line territory, and that 30 cents was the amount contended for as the actual cost per barrel. These assumptions do no violence to the facts, as it is conceded by the Mexican company that the cost per barrel would be the same, whether based on yearly average investment or on number of barrels. The total production of 30,000,000 barrels of oil at 15 cents per barrel was sufficient to retire that half of the total investment which was made by the end of 1919 in the original pipe line territory. Half of that production came from that territory and included the oil taken from the Obando lease; the other half came from the new pipe line territory, but passed through and had the equal use of the original pipe line equipment. If each half contributed equally, 15 cents per barrel would have been the actual cost of transportation. There would then be left half of the total investment which was created after 1919 to be retired, either with or without the aid of production that came from the original territory. It is on the theory of equal contribution by the production in the old territory to the cost of transportation in the new, resulting in a flat rate for both, that the claim is advanced that the actual cost was 30 cents or more per barrel. But we are of opinion that this theory ought not to be accepted. It is conceded in the brief of counsel for the Mexican company that the pipe line in the new territory added very little to the investment and operating expenses, and this concession is in harmony with the evidence. In the first place, the additional investment was made for the benefit of the refinery, and, regardless of the apportionment of the experts, it is

14

apparent that no investment after 1919, aside from the cost of extending the pipe line, was necessary to afford transportation of oil from point of production to ships at Port Lobos. The terminal and loading facilities were adequate after as well as before 1919, due to the decreased production in the original pipe line territory. There may have been, as it seems to us was admitted, unwise and unnecessary expenditures for the benefit of the refinery; but in any event it does not appear that such expenditures or any part thereof should be taxed against the production in the vicinity of the Obando lease. The capital investment was practically doubled after salt water began to make its appearance in the Mexican company's wells, and in other wells in which it had no interest, in the original pipe line territory. The wells on the Rosas lease had gone dry, and so had the wells on lot 162 adjoining the Obando lease. In the nature of things, the new capital investment could not have been intended to benefit the wells that had become or were rapidly becoming exhausted. Under the circumstances, we are of opinion that the production in the original territory, in which the Obando lease is located, should not be taxed anything on account of the increased investment after 1919 which inured principally to the benefit of the refinery.

■■ It was not error to require the payment of interest at the legal rate. Although the amount due is in dispute and is unliquidated, yet, if a claim represent a pecuniary loss which may be ascertained with reasonable certainty, interest should be allowed. Miller v. Robertson, 266 U. S. 243, 258, 45 S. Ct. 73, 69 L. Ed. 265; Kishi v. Humble Oil Co. (C. C. A.) 10 F.(2d) 356. Roos contends that the allowance made for overhead expenses and proportion charges was excessive. The evidence shows that they were just and fair considering the work done and the services rendered.

■■ The Mexican company did not become liable for the highest market value of oil produced from the Obando lease between the dates of production and accounting on the theory advanced by Roos that it converted the oil. It did not. It had legal title to the oil, and the undoubted right to sell it. Nor did the Mexican company become liable to Roos for interest at the highest rate on the theory advanced by him that it was a trustee and had used trust funds for its own benefit. The general rule is that a lessee in an oil lease is not a trustee for the lessor, but that the two deal with each other at arm's length.

The lessee is not bound to work unprofitably for himself for the profit of the lessor. 18 R. C. L. 1212. While the parties at interest here were not lessor and lessee, yet the general rule just stated applies to them; for the rights of Roos were not greater than those of the lessor, nor were the obligations of the Mexican company more burdensome than those of the lessee, under an ordinary oil lease. Their contract is the measure of their rights and obligations; and it is very clear that it was not the intention to limit the right of the Mexican company to develop its own wells. There was nothing inconsistent in the provision that it should also develop the lease in which Roos was interested. The sum of $58,000, on which Roos claims interest, was paid after the end of the accounting period. Nothing more need be said about the interest item, since the account was not closed by the decree.

■■ As to the Texas Company. The ground on which Roos sought to assert his several claims against the Texas Company was that the Mexican company was its mere instrumentality or agent. It is insisted in the first place that the Texas Company is still a party to the suit, because it was originally made a party and filed an answer, and no order was entered dismissing it from the case. After the answer referred to was filed in the state court, Roos secured an order of removal to the federal court on the ground, not that he had a separable controversy, but that Burton had made the Texas Company a party fraudulently, in order to deprive the federal court of jurisdiction. While a motion to remand was pending, Burton's trustee in bankruptcy filed an amended bill of complaint which asserted no cause of action against the Texas Company, and did not even name it as a party defendant. Roos first sought to bring the Texas Company back into the case in his counterclaim, but in this he failed; and an order was entered, according to the record before us, dismissing that company from the suit.

The reason for the organization of the Mexican company is not left open to doubt. The Texas Company was unwilling to surrender its right to appeal to the government of the United States for the protection of its property, in order to comply with the decrees of Carranza and article 27 of the Constitution of Mexico. For the purpose of doing business which it was unable or unwilling to do itself, it organized a company under the laws of Mexico. Roos thoroughly understood the situation and was bound to know that the contract might, and in all probability

would be performed by just such a corporation as the Mexican company; for that corporation was organized in literal compliance with the contract. The Texas Company subscribed to all its capital stock, and Roos agreed to accept its obligation to perform the lease and pay him for his share of the oil. The circumstance that the Texas Company owned all the stock of the Mexican company is not sufficient to support the inference that the former either dominated the board of directors of the latter or was transacting business in Mexico. Porter v. Pittsburgh Bessemer Steel Co., 120 U. S. 649, 670, 7 S. Ct. 741, 30 L. Ed. 830. Any corporation has the power of control over another in which it owns all the capital stock, but that is immaterial in the absence of proof of the exercise or use of that power in such manner as to cause a wrong or injury to the complaining party. Peterson v. Chicago, etc., Ry. Co., 205 U. S. 364, 27 S. Ct. 513, 51 L. Ed. 841. It was not shown that the Texas Company interfered with the directors of the Mexican company in any matter connected with the development of the lease or dominated it in fixing the prices paid for the oil. That it may have controlled its subsidiary in other matters, in the view we take of the case, affords to Roos no cause for complaint.

As to the Lane, Wolters & Storey branch of the case. · The burden was on Roos to prove that the services of his attorneys were to continue after the contract was executed. His letters to Wolters cannot be used to corroborate his testimony, as they were mere self-serving declarations; and, unlike unchallenged oral statements made face to face by one party to another, they have no probative force in the absence of an assenting reply. 10 R. C. L. 1150. Wolters, it is true, advised Roos about the mortgage which postdated the contract; but it is to be remembered that they were kin, and that Wolters too had a personal interest in the contract. He was also attorney for the Texas Company, and it was not unreasonable that he would refuse to agree to take a case or urge a claim against it, though he might be willing to attempt to persuade Brooks, another of that company's attorneys, to sign a contract that was acceptable to Roos. Before the decision on this branch of the case was announced, Wolters claimed credit for the insertion in the contract of the clause which made it the duty of the Mexican company to market the oil. After that decision was announced, he testified that the parties to the contract understood and agreed that the oil was to be marketed at the wells. The inconsistency between these two statements, the one given before and the other after the judge's decision, if any exists, is so slight, and so subject to the explanation that on both hearings Wolters had in mind value of oil at the wells, that it cannot be said Wolters was shown by a preponderance of the testimony to be unworthy of belief. We accept the decision of the district judge on the conflict in testimony given by these two witnesses. Assuming the decision of the District Judge to be correct, Roos appeals to those provisions of the contract which authorize the deduction of the $10,000 loan received by him before it was executed in support of a contention that the fourth interest of Lane, Wolters & Storey should have been charged with a fourth of the loan. But the fact that the whole half interest was made security for the loan is no proof of the agreement between Roos and his attorneys.

Quite naturally, Brooks was not going to give up any of his security. The construction of the contract contended for would equally as well hold the fourth interest of the attorneys for the $5,000 loan also, thereby securing what Roos admits was his debt, and for which he alone was responsible as between himself and his attorneys. This final contention on this branch of the case is not aided by the contract.

As to the claim for damages. Roos cannot complain of delay prior to the execution of the contract in February, 1917, nor, as against the Mexican company, prior to its organization in March of that year. We pass without further comment the claim of subsequent negligent delay in beginning and continuing operations on the wells that were drilled on the Obando lease; for, as has been stated, such delay as occurred was caused by political conditions in Mexico, which were always excepted, and was not attributable to any negligence on the part of the Mexican company. The lease was in undeveloped territory, though the prospects of discovering oil on it were good, since it lay between wells that were producers, both to the north and to the south. The inference that Obando No. 1 was deliberately placed in dry territory is unsupported by the evidence. There was good reason for locating it as an offset to Mexican Gulf's well No. 1, which was then being driven on the adjoining lot 148, but which as it turned out was also dry. Nor can it be said that Obando No. 1 was drilled to too great a depth; Roos himself did not think so at the time, for the continuance of

drilling met with his approval. The loss of the drilling tools in Obando No. 2 cannot fairly be attributed to any intention to impede the flow of that well; because it was in undeveloped territory and the depth to the Tamasopa lime was unknown. As soon as shale was reached, drilling was stopped. Nor can it be inferred that the loss of drilling tools was due to negligence. The only just inference is that the depth to the pool of oil was underestimated. Obando No. 4 was drilled as an offset to the completed and large producing well Libertad No. 1, and to Libertad No. 2 then in process of being drilled. It is rather extreme to argue that the completion of Obando No. 4 was either negligently or intentionally delayed, in the face of testimony that it was impossible to get a permit and that drilling when it was attempted without a permit was stopped by the Carranzistas. That drilling was allowed to proceed south of kilometer 22 is explained by the circumstance that the Paelazistas were in control of that part of the oil field and allowed explorations for oil to be carried on without a permit. Discrimination against the Obando lease in favor of the Rosas lease was not shown; as the wells on each lease were made to produce up to their full capacity. To say that the wells on the Rosas lease drained the wells on the Obando lease is merely to speculate about things incapable of proof. The two leases were a considerable distance apart and between them were other wells. The Juan Casiano alone, it would seem, was sufficient to prevent the passage of oil from the Obando to the Rosas lease. All the geologists who testified in the case, except Small, were of the opinion that a structural break or fault separated the oil field into two pools, and prevented the flow of oil from one into the other; and that the lots immediately south of the break were in dry territory. Their opinion, if not in large part founded upon, was at least greatly strengthened by, the fact that dry holes were encountered on lots 148, 153, 96, and 162 just south of the line where the break was supposed to be. Small's contour map also corroborated his brother geologists in every detail; and in his testimony he only sug-

gested the bare possibility that oil circulated through the break, or that there was only one pool. As lawsuits ought not to be decided on mere possibilities, as we take it, the evidence establishes that the Obando wells in the north pool were not drained by the Mexican company's wells on lots 114 and 133, or by any other well located in the south pool. All of lot 153, except the part on which wells were drilled, lot 154, and the northern part of lot 96 of the Obando lease, according to the overwhelming weight of the evidence, were south of the break and in dry territory, and reasonably had been demonstrated to be so before the Mexican company in the development of the lease was under a duty to drill wells on them. The theory that salt water would always cause the abandonment of the deepest well first and the shallowest well last must be given up in the light of the facts. The Beyers well ceased to produce in 1919, yet the well on lot 114 was drilled afterwards to a greater depth, produced 6,000,000 barrels, and was still flowing in 1924. Libertad No. 1 went to salt water before Libertad No. 2 did, yet the two wells were close to each other and the former was 50 feet shallower than the latter. Other similar comparisons could be made, but enough has been said to indicate the unreliability of the theory advanced. It may be that this theory failed because the assumption upon which it was founded, namely, that the Tamasopa lime was equally and uniformly porous throughout the oil field, was an erroneous one; but, if so, it was not possible to prove that the lime was equally or uniformly porous in any particular part or section of the field. The assumption was as unreliable as the theory. In the face of proof that the undrilled territory was dry, and that the assumption of uniform porosity was too uncertain and speculative, the trial court cannot be put in error for refusing to allow the claim of Roos for damages.

The conclusion is that reversible error is not made to appear by any of the assignments. Each appellant will be ordered to pay its or his own costs.

The decree is affirmed.