**ASHLAND OIL & REFINING COMPANY,**

v.

**Carlton BEAL.**

**No. 15316.**

United States Court of Appeals
Fifth Circuit.

July 22, 1955.

Rehearing Denied Oct. 12, 1955.

W. B. Browder, Jr., Midland, Tex., Henry Russell, Pecos, Tex., Stubbeman, McRae & Sealy, Midland, Tex., of counsel, for appellant.

D. L. Case, Dallas, Tex., A. W. Walker, Jr., William L. Kerr, Midland, Tex., Robertson, Jackson, Payne, Lancaster & Walker, Dallas, Tex., of counsel, for appellee.

Before RIVES, Circuit Judge, and DAWKINS and DE VANE, District Judges.

RIVES, Circuit Judge.

The principal issue is whether appellee Beal is personally liable for one-fourth of the cost of drilling, developing and operating on 237.33 acres of the Elser oil and gas lease in Upton County, Texas, owned by Beal and Ashland in the proportions of one-fourth and three-fourths, respectively. The Elser lease secured by Beal on December 9, 1950, was on a total of 277.33 acres of land, but the Beal-Russell No. 1 well had been drilled on 40 acres in the northeast corner thereof prior to the transactions here involved. Beal had executed division orders to Ashland covering Beal's share of the oil from that well and from fourteen more producing leases other than the Elser lease.

Beal brought this suit to recover the value of his share of the oil produced from the Beal-Russell No. 1 well and from said fourteen other producing

leases which was being withheld by Ashland. Ashland defended, claiming that it had rightfully withheld all such amounts, and also filed its counterclaim against Beal for one-fourth of the costs and expenses incurred in drilling, developing and operating on 237.33 acres of the Elser lease under the terms of a written operating agreement between Beal and Ashland, dated as of the 8th day of April, 1951, which Ashland claims to be the contract between the parties. Answering Ashland's counterclaim, Beal pleaded substantially four defenses, which for convenience of discussion we re-arrange in the order following.

First: Conceding arguendo that the written operating agreement controlled, Beal said that Ashland had failed to give Beal notice of its intention to drill the wells on said leasehold with the result under the terms of said agreement that Beal would be considered as having elected not to participate in the cost of the wells.

Second: The operating agreement never became effective because it was delivered on a written condition which has not been fulfilled.

Third: The operating agreement was executed as a result of mutual mistake.

Fourth: Ashland is estopped from now seeking to hold Beal personally liable.

The case was tried to a jury without distinction as to which of the issues were submitted to the jury as a matter of right, and as to which the jury's verdict was merely advisory. See Rule 39, Fed.Rules Civ.Proc. 28 U.S.C.A. Evidence of oral conversations and letters preceding the written agreement were freely admitted by the court, Ashland reserving exceptions thereto. A number of exceptions were also reserved to the court's charge to the jury. The jury returned its verdict on special issues as set forth in the margin.[1] Each party moved for judgment. The court entered judg-

---

1. "1. That Ashland Oil & Refining Company orally agreed with Carlton Beal that Ashland Oil & Refining Company would carry the one-fourth working interest of Carlton Beal in the lease in question without any personal liability on his part.

"Answer 'Yes' or 'No.'

"Answer Yes.

"2. That Ashland Oil & Refining Company orally agreed with Carlton Beal that Ashland Oil & Refining Company would carry the one-fourth working interest of Carlton Beal in the lease in question and, Ashland Oil & Refining Company in its purchase of the 8-5/8th inch casing used on the lease, orally agreed to then pay Carlton Beal $4,526.83 for his one-fourth interest in such casing and carry the amount as a part of the development costs.

"Answer 'Yes' or 'No.'

"Answer Yes.

"3. That the lease, assignments, net profits agreement and written operating agreement bearing date of April 8th, 1951, were the agreements between the parties with respect to the payment of developing and operating costs incurred on Carlton Beal's one-fourth working interest on the lease in question.

"Answer 'Yes' or 'No.'

"Answer No.

"4. That the written operating agreement bearing date April 8th, 1951, was delivered by Carlton Beal on condition that his working interest in the lease in question was to be carried by Ashland Oil & Refining Company and such agreement to carry would be reduced to writing at a later date and be signed by the parties.

"Answer 'It was' or 'It was not.'

"Answer Yes.

"5. That the written operating agreement bearing date April 8th, 1951 was signed and delivered by the parties thereto as the result of a mutual mistake as to the method of payment by Carlton Beal to Ashland Oil & Refining Company of one-fourth of the developing and operating costs and that the actual agreement of the parties controlling such payments was otherwise than as set out in the operating agreement bearing date April 8th, 1951.

"Answer 'Yes' or 'No.'

"Answer Yes.

"6. That Ashland Oil & Refining Company by its conduct led Carlton Beal to believe that such company had agreed to carry his one-fourth interest in the lease in question.

"Answer 'Yes' or 'No.'

"Answer Yes.

ment for Beal against Ashland in the sum of $62,473.34 and interest thereon from July 1, 1954; that Ashland take nothing by its cross-action; and that the operating agreement be reformed as prayed by Beal.

*First:* Relating to what we have designated as Beal's first defense to Ashland's counterclaim, the court submitted to the jury special issues 10, 11 and 12, which the jury answered favorably to Ashland. While there was no evidence that Ashland gave Beal the formal kind of notice called for in the operating agreement, it appeared without conflict that notices of the proposed locations and the drilling program were sent to Beal both by the Railroad Commission and by Ashland, and that Beal, in a number of letters to Ashland, discussed the drilling of these wells in a manner which showed that he considered himself as a working partner therein. We agree with the jury, therefore, that Beal's first defense to Ashland's counterclaim was not sustained.

*Second:* The facts with reference to Beal's second defense to Ashland's counterclaim, conditional delivery of the written agreement, must be briefly reviewed. Two copies of the operating agreement appear to have been signed by Beal on April 8, 1951. These were forwarded to Ashland by a letter dated April 11, 1951, stating that "it is understood that your company will execute the same and return one copy to this office," and further calling attention that Exhibit A,

"7. Do you find from a preponderance of the evidence that at the time of the telephone conversation or conversations between Carlton Beal and C. H. Marshall, for Ashland Oil & Refining Company, and the subsequent conversations between C. H. Marshall, for Ashland Oil & Refining Company, and R. D. Carpenter for Carlton Beal, it was the intention or in the contemplation of the parties that before there was any contract the terms thereof should be reduced to writing and signed by the parties.

"Answer 'It was their intention that the contract be reduced to writing' or 'It was not their intention that the contract be reduced to writing.'

"Answer It was their intention that it be reduced to writing.

"8. Do you find from a preponderance of the evidence that it was a part of the agreement between Carlton Beal and R. D. Carpenter on the one hand, and C. H. Marshall and John Crawford for Ashland Oil & Refining Company on the other hand, that Ashland should have a call on Beal's oil for five (5) years?

"Answer 'Yes' or 'No.'

"Answer Yes.

"9. Do you find from a preponderance of the evidence that it was a part of the agreement between Carlton Beal and R. D. Carpenter on the one hand, and C. H. Marshall and John Crawford for Ashland Oil & Refining Company on the other hand, that Beal would secure payment of his part of the drilling and operating costs of the Elser Lease by a mortgage on Beal's interest in the Beal-Russell No. 1 well?

"Answer 'Yes' or 'No.'

"Answer No.

"10. Do you find from a preponderance of the evidence that on or before July 25, 1951, Ashland Oil & Refining Company gave Carlton Beal notice of its intention to proceed to drill five (5) wells on the Elser Lease in addition to those two (2) wells already completed on said lease?

"Answer 'Yes' or 'No.'

"Answer Yes.

"11. That Ashland Oil & Refining Company notified Carlton Beal of its intention to drill each additional well after Well No. 1, and notified Carlton Beal of the estimated cost of each such well, all in advance of the commencement date of each such additional well.

"Answer 'It gave notice,' or 'It gave notice on wells numbers (numbering them) 2, 3, 4, 5, 6.'

"Answer Yes it gave notice.

"12. If you answer 'Yes' to the foregoing paragraph 11 of your verdict, and only in that event, then answer:

"That Carlton Beal did or did not within fifteen days after he was notified of Ashland Oil & Refining Company's intention to drill additional wells being notified of the additional costs of each such well after Well No. 1, agree in writing that he, Carlton Beal, would personally participate in the drilling and operating costs of each such additional well.

"Answer 'He did not agree on any well' or 'He did agree on wells numbers (numbering them) 2, 3, 4, 5, 6.'

"Answer Yes he did agree."

describing the lease affecting the joint properties, had not been filled in and giving the information from which it could be filled in. Ashland returned the two copies which Beal had signed, together with two additional copies, by a letter dated May 17, 1951, in which it was stated that all four copies had been signed and acknowledged by Ashland, and in which it was requested that Beal acknowledged the two copies he had originally signed, and sign and acknowledge one additional copy, and return these three copies to Ashland. Beal complied with this request and forwarded the three executed and acknowledged copies to Ashland along with a letter dated May 23, 1951, from Beal's employee, Carpenter, to Ashland's employee, Crawford,[2] which forms the basis for Beal's claim of conditional delivery of the operating agreement.

Peculiar significance is attached to the word "carry" as used in that letter (footnote 2). From the testimony of a number of oil operators, it seems to be established that in oil field terminology the term "carried interest" means an interest that pays no part of the initial development except out of the oil and gas produced, though the detailed terms of such an interest would have to be fixed by agreement.[3] Beal testified that he expected such details to be worked out in a written agreement, but that that was never done. Ashland freely concedes that an oral understanding existed by virtue of which it was to finance Beal and that Ashland was later to submit the necessary papers for that purpose, but it denies any intention to "carry" Beal in the sense that he would not be personally liable for his proportionate share of the cost of development. Its agent who received the letter (footnote 2) testified that, if the term "carried interest" had been used, he would have understood the letter in the sense to which Beal testified, but that, "* * * there is a big difference in my mind between 'to carry' and to own a carried interest," and that that letter did not give him the information that Beal thought that he would have no personal liability.

Beal argues that the last sentence in the letter, "When the above papers have been prepared and executed I believe this deal will be wrapped up", made the preparation and execution of the loan

---

**2.**
"Carlton Beal
"11699 Bellagio Road
"Los Angeles, 49
"May 23, 1951

"Mr. John L. Crawford,
215 Crawford Hotel,
Midland, Texas.

"Dear John:

"Complying with your letter of May 17, 1951, we are transmitting herewith three executed and acknowledged copies of Operating Agreement dated April 8, 1951, between Ashland Oil & Refining Company and Carlton Beal.

"It is my recollection that you are going to prepare Development Loan Agreement between Ashland and Carlton providing that Ashland is to carry his share of development and production expenses until payout. Carlton advises me that in accordance with his conversation with Cob Marshall this Loan Agreement would cover six Spraberry wells on the Elser lease at 4 to 4-½% interest payable out of 80% of 25% of the working interest gross revenue. I further recall that this Development Loan Agreement or a separate letter agreement was to be prepared covering Ashland's call on Carlton's share of the oil. In this instance there was to be a provision that Ashland would have a call on said oil for five years and there after until bona fide sale of Carlton's interest.

"When the above papers have been prepared and executed I believe this deal will be wrapped up.

"My best regards,
"(S.) Dick,
R. D. Carpenter."

**3.** For example, whether the operator, that is the party who is putting up the cost of development, has control of the oil and the right to sell it or the carried party can sell his part of the oil; whether the carried interest is to be carried for the initial development phase only of the operation or for the life of the lease; whether interest is to be charged and, if so, the rate; who would own the equipment, such as pipe, motors and pumps, if and when production ceased; and other detailed terms.

agreement a condition precedent to the effectiveness of the operating agreement. There is a serious question as to whether the operating agreement had not been unconditionally delivered and made effective prior to the letter (footnote 2); but assuming arguendo that it had not, it seems to us far fetched to claim that that letter attached a condition precedent to the operating agreement becoming effective. Clearly, we think, that was not Beal's intention for he has himself throughout depended on the operating agreement in other respects. For example, he billed Ashland for engineering work which he had done on the Elser lease pursuant to Ashland's commitment in the operating agreement to pay therefor; he sold certain pipe to Ashland, and sent Ashland a bill "because they (Ashland) had agreed in this operating agreement to pay all expenses within a certain time and that was one of the expenses." Both on direct and on cross-examination, Beal testified that it was his contention that portions of the operating agreement are effective, and that he relied upon portions of that agreement.

■ The conclusion to which Beal's contention of conditional delivery leads is thus expressed in his counsel's brief: "Since Ashland exercised its legal right as a cotenant to drill and operate the lease without any contract with its cotenant, Beal, it is not entitled to hold him personally liable for the drilling and operating costs incurred by it, but is merely entitled to recover Beal's one-fourth of those costs out of Beal's one-fourth share of the production." We do not understand that the district court in rendering its judgment proceeded on any such theory, for it actually ordered the operating agreement as an existing contract to be reformed to express what it considered to be the intention of the parties. There was no substantial evidence, we think, to sustain the contention that the written operating agreement never became effective because delivered on a written condition which has not been fulfilled.

■ *Third:* Beal's third defense to Ashland's counterclaim, that the operating agreement was executed as a result of mutual mistake, was evidently that adopted by the district court in rendering its judgment. It does appear practically without dispute that there was some verbal understanding, which Ashland was later to reduce to writing, under which Ashland was to finance Beal's share of the cost of development, but the evidence is in sharp conflict as to whether that understanding went to the extent that Beal was to have no personal liability and that Ashland was to be repaid only out of the oil and gas produced from the leasehold. There was substantial evidence to support the jury's verdict on the first issue submitted (footnote 1, *supra*), that Ashland orally agreed to "carry" the one-fourth working interest of Beal without any personal liability on his part.

■ That, however, is not enough to authorize the reformation of the written operating agreement for mutual mistake. It must further appear that there was a mutual mistake as to the contents or effect of the written agreement itself. Tunnell v. Neill, Tex.Civ.App., 33 S.W.2d 530, 533; Long v. Humble Oil & Refining Co., Tex.Civ.App., 154 S.W. 2d 925; Sun Oil Co. v. Bennett, 125 Tex. 540, 84 S.W.2d 447; Henning v. Jefferson Standard Life Ins. Co., 5 Cir., 129 F.2d 225; 2 Pomeroy's Equity Jurisprudence, 4th ed., Sec. 854. There could be no mistake as to the effect of the written agreement in merging all prior verbal negotiations and understandings, for that is the law under which all parties must operate and which must certainly have been in fact understood by these parties who had vast business experience in large affairs. Nor was there any mistake as to the contents of the written operating agreement, for Beal himself testified that he read it, submitted it to his attorneys, and that he and his lawyers and tax consultant knew what he was doing. Indeed, Beal's counsel concedes in brief:

"* * * it appears that both Ashland and Beal knew that the provisions with reference to Beal's paying monthly one-fourth of the developing and operating costs were physically incorporated in the Operating Agreement, * * *."

The district court erred, therefore, in reforming the written operating agreement.

*Fourth*: On Beal's fourth defense to Ashland's counterclaim, the jury in answer to Special Issue No. 6 found that Ashland by its conduct led Beal to believe that Ashland had agreed to "carry" his one-fourth interest in the lease (footnote 1, *supra*). As has been stated, Ashland admits that it had some understanding that it would finance Beal and that Ashland would prepare the necessary papers. Beal followed up his letter of May 23, 1951 (footnote 2, *supra*) with a letter of July 5, 1951, saying:

"This is to remind you and make a matter of record a certain agreement that I have with Ashland Refining Company wherein Ashland is paying all the drilling costs of which my share is 25%. I am to pay my share of these drilling costs out of the production after taking out production costs.

"I would like to know from you how this is to be handled; whether you are to make the payments for oil sales to me and I am to return the check to the Ashland to apply to my account to pay out my share of the drilling costs.

"I would appreciate hearing from you about this matter."

Under date of July 13, 1951, Ashland responded:

"In reply to your letter dated July 5, 1951, please be advised, that John L. Crawford, of our Midland, Texas office, has informed me that he has been corresponding with your Dick Carpenter, with regard to a financing arrangement covering your interest in the subject lease, and also, your #1 Beal-Russell lease, which agreement will prove that all, or a portion of your interest be paid to Ashland Oil & Refining Company, until your proportionate part of the drilling costs have been recovered."

Beal's reply to that letter is of such importance that we copy it in full in the margin.[4] Beal's letter of July 19, 1951

4. "July 19, 1951
"Ashland Oil and Refining Company
 621 Apco Tower
 Oklahoma City 2, Oklahoma
"Attention: Mr. Harry C. Marberry
 "Re. Ashland Oil and Refining Company Beal-Russell
 (Elser) #1—Your No. 2025
"Gentlemen:
"Replying to your letter of July 13, 1951, please be advised that in January of this year Mr. R. D. Carpenter of this office met with your Mr. C. H. Marshall in Midland at which time the Elser Lease, Upton County, Texas was negotiated to your company.
"It was the desire of the undersigned that your company finance my 25% working interest in the wells to be drilled on the Elser Lease, both as to drilling and production costs, and it was agreed that your company was to retain 100% of proceeds from oil and gas production until the aforesaid costs, plus 4-½% interest per annum were recovered. At the time Mr. Marshall and Mr. Carpen-

ter were discussing the matter there was only one producing well on the subject lease. Understandably Mr. Marshall stated that your Company's policy was to require additional collateral, so that in event a dry hole or dry holes were drilled on the Elser Lease Ashland would not have an unduly long payout period.
"Mr. Carpenter then agreed with Mr. Marshall that the income from my 25% working interest (1/4 of 5/8 of 8/8) in the Beal-Russell #1 well would be pledged as additional security to apply when and if a dry hole were drilled on the property. The Elser wells were to stand on their own unless a dry hole were drilled on the Elser Lease, at which time my income from the Beal-Russell #1 well would go to Ashland until drilling and production costs plus interest on the Elser wells had been recovered. It was not contemplated that my Beal-Russell #1 income would go to Ashland from the beginning of Ashland's operations on the Elser Lease, however.

(footnote 4, *supra*) was never answered. The record does not reveal any further correspondence between the parties with respect to the financing of Beal's interest until some ten months later. Meanwhile, production from the lease had decreased more than fifty per cent. It was not until May 22, 1952, that Ashland wrote stating:

"At long last I have prepared and submit for your approval a mortgage and note from Carlton Beal, in favor of Ashland Oil & Refining Company covering the advances made to Mr. Beal in the development and operation of the Elser Lease."

Enclosed was an installment promissory note and a deed of trust for Beal's execution. Beal refused to execute the note and deed of trust and wrote Ashland on June 2, 1952, that the instruments submitted were not in accordance with their agreement.

At the time Ashland received Beal's letter on July 19, 1951 (footnote 4, *supra*), the drilling of wells numbered 2, 4 and 6 had not been commenced. Under the operating agreement, Beal had a right to elect not to participate in the drilling of those wells. If Ashland had replied to Beal's letter of July 19, 1951, that its understanding of their agreement was not as therein outlined by Beal, it may be that Beal by outside arrangements could have avoided all or a part of the large personal liability to which he was and would be subjected under the terms of the operating agreement. The sharp decrease in gross production from the field did not come until the following April.

Ashland urges that its failure to answer Beal's letter cannot be treated as an admission, citing Texas Co. of Mexico, S. A. v. Roos, 5 Cir., 43 F.2d 1, 14;

Leach & Co. v. Peirson, 275 U.S. 120, 48 S.Ct. 57, 72 L.Ed. 194; Aetna Life Ins. Co. v. Kepler, 8 Cir., 116 F.2d 1; Throckmorton v. St. Louis-San Francisco Ry. Co., 8 Cir., 179 F.2d 165; and McCormick & Ray, Texas Law of Evidence, Sec. 504, p. 653. With this we would agree if Ashland were under no duty to reply. Ashland had, however, promised to draft the agreement to finance Beal, and it had failed to do so. It knew that Beal was waiting for it to fulfill its promise to draft that agreement, and if it planned to draft an agreement differing from Beal's understanding, it should have promptly so advised him, especially in view of Beal's request to that effect (footnote 4, *supra*).

■ Silence alone, where there is a duty to speak, may create an estoppel. As recognized by the Supreme Court of Texas in Johnson v. Sovereign Camp, W.O.W., 125 Tex. 329, 83 S.W.2d 605, 609; "'From pure but misleading silence, coupled with a duty to speak, an estoppel will arise.' Bigelow on Estoppel, 565". Likewise, the same Court in Burnett v. Atteberry, 105 Tex. 119, 145 S.W. 582, 587, stated:

"The principle [estoppel] is an important one in the administration of the law. It not infrequently gives triumph to right and justice where nothing else could save them from defeat. It proceeds upon the ground that he who has been silent as to his alleged rights when he ought in good faith to have spoken, shall not be heard to speak when he ought to be silent. * * *

"'Estoppel by silence arises where a person, who by force of circumstances is under a duty to another to speak, refrains from doing so and thereby leads the other to believe

"I believe the above outlines our understanding made with Mr. Marshall. Would you kindly verify the above with him and prepare the financing agreement accordingly. If the above is not strictly in accordance with Mr. Marshall's understanding, please advise.

"Very truly yours,
Carlton Beal.

"CB/cmj
"cc: Mr. C. H. Marshall
Mr. John L. Crawford
Mr. Hal Rachal".

in the existence of a state of facts in reliance upon which he acts to his prejudice.' "

See also, Commercial Nat. Bank v. Nacogdoches Compress & W. Co., 5 Cir., 133 F. 501.

■ We think that Beal was clearly entitled to assume that Ashland's failure to reply to his letter of July 19, 1951 (footnote 4, *supra*) indicated its approval of his understanding of the agreement to finance, and that, Ashland is now estopped to deny that the terms outlined in that letter constituted the financing agreement between the parties.

The judgment is, therefore, modified so as to eliminate that part reforming the written operating agreement dated April 8, 1951, and in lieu thereof to provide that Ashland is estopped to deny that its agreement to finance Beal is in accordance with Beal's letter of July 19, 1951 (footnote 4, *supra*), and, as so modified, the judgment is affirmed.

Modified and affirmed.